STATE of Tennessee By Thomas H. SHRIVER, District Attorney General, on relation of Thomas A. HIGGINS

v.

Winfield DUNN et al.

Supreme Court of Tennessee.

March 19, 1973.

Rehearing Granted In Part April 23, 1973.

Thomas H. Shriver, Dist. Atty. Gen., Thomas A. Higgins, Nashville, for appellant.

Robert H. Roberts, Asst. Atty. Gen., Nashville, for David M. Pack.

Ward DeWitt, Jr., Nashville, Hewitt P. Tomlin, Jackson, for Thomas F. Turley, Jr.

Cecil D. Branstetter, Nashville, for Robert L. Taylor.

## OPINION

McCANLESS, Justice.

This suit has two aspects: first, it is an action in the nature of *quo warranto,*

brought under the authority of Section 23–2801 et seq., T.C.A., in the name of the State of Tennessee by Thomas H. Shriver, District Attorney General, on relation of Thomas A. Higgins, a practicing lawyer and citizen of Davidson County, to have judicially determined the conflicting claims of two persons to the office of Judge of the Supreme Court of Tennessee left vacant by the death of Judge Larry Creson; and, second, it seeks to have declared invalid and unconstitutional Sections 17–701 to 17–716, inclusive, T.C.A., enacted originally as Chapter 198 of the Public Acts of 1971, the statute that provides for the nomination, appointment, and election of judges of the appellate courts of the State.

The Chancellor decreed that neither of the two claimants, Thomas F. Turley, Jr., and Robert L. Taylor, is entitled to the office; but because it was his opinion that it had been unnecessary in reaching that decision to pass upon the validity of Section 17–701 et seq., T.C.A., he declined to make an adjudication of the validity of the statute.

Thomas F. Turley, Jr., and Robert L. Taylor have appealed from the Chancellor's decree and the District Attorney General and the relator have appealed from his action in declining to rule on the validity of the challenged statute.

The facts were stipulated and the appeals are to the Supreme Court.

On June 19, 1972, Judge Larry Creson, a member of this Court, died at his home in Memphis. The following day, June 20, 1972, Governor Winfield Dunn officially gave notice of the death to the Chairman of the Appellate Court Nominating Commission, established under the provisions of Section 17–701 et seq., T.C.A., (Chapter 198 of the Public Acts of 1971), and requested him to initiate proceedings to nominate three persons eligible for appointment to fill the vacancy.

On July 18, 1972, the Commission selected and submitted to the Governor the names of three persons from the list of those who had been considered for nomination. Those whose names the Commission submitted were Charles W. Miles, III, Mark Anthony Walker, Jr., and Thomas F. Turley, Jr. On July 21, 1972, the Governor announced that he had appointed Mr. Turley to fill the vacancy, the appointment to be effective September 1, 1972.

The Governor did not issue writs of election to the election commissioners of the State, in accordance with Section 17–113, T.C.A., ordering an election to fill the vacancy and there was no publication calling such an election.

On July 31, 1972, Robert L. Taylor publically announced that he was a write-in candidate to fill the vacancy in the election to be held August 3, 1972. The announcement received wide publicity in the newspapers and on the radio and television stations of the State. The news media also gave publicity to a statement by the Governor that Mr. Taylor was not eligible for the office.

In the election of August 3, 1972, throughout the State more than 668,000 persons voted. Of these, 4,030 cast write-in ballots for Judge of the Supreme Court. Votes were cast for the office in 46 counties; Robert L. Taylor received 3,301 votes, Thomas F. Turley 555 votes, and others 174 votes.

After the election of August 3, 1972, Mr. Taylor announced that he had been elected and would fill the office.

On August 18, 1972, the Secretary of State issued Mr. Taylor a certificate of election that contained the recitation that he had "been duly elected Judge, Western Division, Supreme Court of Tennessee in the August 3, 1972, General Election." On August 23, 1972, Mr. Taylor took the oath as a Judge of the Supreme Court before one of the Chancellors of the State.

On August 19, 1972, the Governor issued Thomas F. Turley, Jr., a commission appointing him "Justice of the Supreme

Court of the State of Tennessee, effective September 1, 1972, to serve until September 1, 1974, and until he shall have been elected and retained in office pursuant to Section 17–715, Tennessee Code Annotated."

The complaint in this suit, filed September 21, 1972, named as defendants Governor Winfield Dunn and Secretary of State Joe C. Carr. An amended complaint, filed September 26, 1972, added as defendants David M. Pack, Attorney General and Reporter, Thomas F. Turley, Jr., and Robert L. Taylor.

At the hearing the Chancellor dismissed the suit as to defendants Dunn, Carr, and Pack, and none of the appellants has assigned as error the Chancellor's action in dismissing those defendants. Attorney General Pack, although dismissed as a defendant, participates in the appeal because of the declaratory judgment aspect of the suit.

At the hearing the Chancellor was of opinion and held that an action *quo warranto* lies against the defendants, Thomas F. Turley and Robert L. Taylor. In his memorandum opinion he wrote:

"Section 23–2801(1) is not to be read so narrowly as would give rise to a quo warranto only when someone is actually performing the functions of a given office. This statement is consistent with Tennessee case law. In State, ex rel., Bryant v. Maxwell, 189 Tenn. 187, 224 S.W.2d 833 (1949), the Supreme Court noted that the complaint charged Maxwell with ' . . . unlawfully *attempting* to qualify as and hold and exercise the office of a Justice of the Peace of Bradley County. . . .' 187 [189] Tenn. at 189 [224 S.W.2d 833]. [Emphasis added.] Paragraph XIII of the original complaint in Bryant alleged the following:

" 'And your relator charges that defendant in pursuant of his fraudulent, irregular and illegal pretended election, has attempted to gain the office of Justice of the Peace and has been sworn in and attempted to qualify and now holds himself out as a Justice of the Peace for the City of Cleveland, Tennessee.' [Emphasis added.]

In *Bryant* there was no question but that the *attempt* to qualify as, hold and exercise the office gave rise to a quo warranto action under Section 23–2801.

"Such a holding is consonant with the clear legislative purpose underlying the enactment of Section 23–2801. The Supreme Court of Illinois in considering its quo warranto statute stated the underlying legislative purpose in the following terms:

" 'But the motion is resisted solely on the ground the petition does not show the essential fact of possession and *user* of the office by defendant, which he is charged with having usurped. . . The objection does not go to the merits of the controversy, and *no subtle reasoning ought to be indulged to defeat the demand of the people to know by what warrant defendant sets up any claim to the office as alleged.*' [Emphasis added.]

People ex rel. Evans v. Callaghan, 83 Ill. 128, 134 (1876).

"The 'demand of the people' to know by what right a man claims title to a public office underlies Section 23–2801. This clear legislative purpose would be defeated were this Court to read the statute so narrowly as to exclude from its scope the two claims here in question; for both Turley and Taylor claim to possess lawful title to the office in question. Each has exerted every effort he deemed appropriate to secure the office. For example, defendant Taylor accepted the Secretary of State's Certificate of Election, took the oath of office, filed copies of the Certificate of Election and the oath of office with the Clerk of the Supreme Court, reported to the of-

fice of the Supreme Court in Memphis and Jackson, appeared in Nashville at the Supreme Court's session on September 6 ready to assume a seat on the Court, filed a quo warranto to keep Judge Cooper from temporarily occupying the vacant seat, and at all times publicly claimed that he is presently holding this office. While defendant Turley has not been so active in attempting to take the seat, there can be no doubt that he claims rightful title to the office; he was issued a commission by the Governor, and he likewise appeared in Nashville at the Supreme Court's session on September 6, he has indicated that if his title to the office is vindicated in this action, he will resign his position as United States Attorney General and accept and perform the duties of the office in issue. These considerations are sufficient to sustain an action in quo warranto against both defendants Turley and Taylor under T.C.A. § 23–2801.

"By holding this to be a quo warranto, the possibility is excluded that this is an election contest. Resolution of the competing claims here at issue does not require the Court to go behind the election returns. Thus, this is not an 'election contest' under the case law of Tennessee. Adcock v. Houk, 122 Tenn. 269, 122 S. W. 979 (1909), State, ex rel., Bryant v. Maxwell, 189 Tenn. 187, 244 S.W.2d 833 (1949). Consequently the jurisdiction and venue requirements which operated in 'election contests' are not applicable here. This is a quo warranto. The action brought in this Court meets the jurisdiction and venue requirements of quo warranto."

We agree with both the reasoning and the conclusion of the Chancellor that this is an action *quo warranto* under Section 23–2801, T.C.A. None of the appellants assigned as error the action of the Chancellor so holding, and the subject is not an issue in this appeal.

We *first* consider the contention of the appellant, Robert L. Taylor, that he is a lawfully elected and qualified Judge of the Supreme Court of Tennessee. If that contention is valid its validity must depend on the conclusion that this appellant was elected to the office by the write-in vote on August 3, 1972.

Mr. Taylor has assigned four errors in summary as follows: (1) that the Chancellor should have held that the appellant was lawfully elected, (2) that he erred in holding that the recognition of write-in votes "would effectively disfranchise the vast majority of the citizens who cast votes in the state wide election on August 3, . . . . ", (3) that he erroneously failed to consider the Supreme Court's past statements that lack of official notice of an election whose time and place are fixed by the Constitution will not vitiate an election, and that those electors who exercise their right to vote cannot be denied the right to have their votes counted by the fact that other electors chose not to vote, and (4) that the Chancellor, by his decision, deprived the appellant of his office and property without due process of law.

The first assignment is directed at the conclusion of the Chancellor, the second and third are offered in support of the first, and the validity of the fourth must depend on the correctness of the Chancellor's conclusion which the first attacks. It results that the first of these assignments is conclusive of Mr. Taylor's contention.

 An election of a Judge or of a District Attorney General to fill a vacancy can be held at no other time than at a biennial election. The election to fill such a vacancy is a special election though it must be held at the same time as an August general election. This appears from the language of the Constitution, Article 7, Section 5. Hanover v. Boyd, 173 Tenn. 426, 121 S.W.2d 120 [1938].

Article 7, Section 5 of the Constitution of Tennessee provides:

"*Civil officers—Election—Vacancies.*— Elections for Judicial and other civil of-

ficers shall be held on the first Thursday in August, one thousand eight hundred and seventy, and forever thereafter on the first Thursday in August next preceding the expiration of their respective terms of service. The term of each officer so elected shall be computed from the first day of September next succeeding his election. The term of office of the Governor and of other executive officers shall be computed from the fifteenth of January next after the election of the Governor. No appointment or election to fill a vacancy shall be made for a period extending beyond the unexpired term. Every officer shall hold his office until his successor is elected or appointed, and qualified. No special election shall be held to fill a vacancy in the office of Judge or District Attorney, but at the time herein fixed for the biennial election of civil officers; and such vacancy shall be filled at the next Biennial election recurring more than thirty days after the vacancy occurs."

The General Assembly implemented this Section of the Constitution by the enactment of Section 17–112, T.C.A., as follows:

"*Vacancies in office.*—Whenever a vacancy, either by death, resignation, or removal, shall occur in the office of a judge of the Supreme Court or Court of Appeals, circuit judge, or chancellor, or judge of a criminal court, or judge of a special court of equal dignity with circuit and chancery courts, the vacancy in such office shall be filled by the qualified voters of the whole state for supreme judges and judges of the Court of Appeals, and of such judicial district for the other judges, at the next biennial election in August, occurring more than thirty (30) days after such vacancy, and in the meantime the governor shall appoint a person learned in the law and constitutionally qualified to discharge the duties of said office until such election can be had. If a vacancy shall occur in the office of a supreme judge or judge of the Court of Appeals, it shall be filled from the grand division of the state in which the vacancy occurs."

These provisions of the Constitution and of the Code require that the vacancy which occurred more than thirty days before the election of August 3, 1972, be filled at that election.

Section 17–113, T.C.A., required the Governor in the circumstances existing to issue a writ of election to all commissioners of election of the state for an election to fill the vacancy. That Section is:

"*Writs for special elections.*—The governor shall order the election by issuing proper writs of election, giving notice thereof.

"In the case of supreme judge or appeals judge, the writs shall issue to all county commissioners of elections in the state, and the notice shall be for at least thirty (30) days, by publication in a newspaper in each grand division of the state. In the case of a circuit judge, chancellor, criminal judge or judge of a special court of equal dignity with circuit and chancery courts, the writs shall issue to the county election commissioners throughout the circuit, chancery division or special district for which the election is to be held, and the notice shall be for at least thirty (30) days by publication in one or more newspapers of the said circuit, chancery division or special district. Whenever the vacancy occurs in sufficient time prior to the election date, notice shall be given and candidates will qualify as in the case of other elections for such office, however, where the vacancy occurs too late for such notice and period of qualification for candidates but more than thirty (30) days before the election, notice will be given at least thirty (30) days as above provided and candidates shall have until twenty-five (25) days before such election in which to qualify as provided by law either as a party nominee or as an independent candidate."

The appellant, Taylor, who relies on election to claim the vacancy, must assume the validity of the above quoted statutes and that they were not repealed by the enactment of Chapter 198 of the Public Acts of 1971, carried into the Code as Sections 17-701 to 17-716, inclusive. The effect of the 1971 enactment, if valid, repealed the provisions for the kind of an election as that under which the appellant, Taylor, asserts title to the office he claims.

The office that Judge Creson held became vacant with his death forty-five days before the biennial election. The Constitution required that the vacancy be filled at that election and to execute the requirement of the Constitution, the Legislature enacted 17-113, T.C.A. The Governor did not order the election as required by that Section.

In Barry v. Lauck, 45 Tenn. (5 Cold.) 588 (1868], a case in which the Court held a special election void for want of notice, the Court said:

"But a mere voluntary omission to vote, on the part of those entitled, where a full and fair opportunity has been offered, will not alone avoid the election. Those who did exercise their electoral rights can not be deprived of the fair results of the election, by the mere failure of others to vote. The question is not whether all the legal voters in the district actually expressed their will at the polls, but whether they had the opportunity which the law requires, to do so.

"This being a special election, notice to the electors was essential to its validity; and for want of this notice, the election, so far as it concerns Macon County, was void.

\* \* \* \* \* \*

"The safety of the State depends upon the preservation of the integrity of the elective franchise and the purity of the elections; and these can only be preserved by requiring the officers charged with duties in regard thereto, to comply with all the essential requisites of the laws placed to guard the franchise against abuse, fraud or violence.

"In the present instance, the number of registered voters in Macon County who did not vote, was more than sufficient, if they had all voted one way, to have changed the result as declared. We have no means of knowing how their ballots would have been cast if they had voted, and must presume their failure to vote was the result of want of notice; and therefore we have no assurance that the result of this election is an expression of the will of the people of that county, or of the judicial district."

Hanover v. Boyd, supra, involved a special election made necessary by the death of a District Attorney General thirty-one days before an August election. In that case the Governor declined to order a special election and to issue writs therefor and undertook to fill the vacancy by appointment. The Chancery Court thereupon issued a mandatory injunction that required the election commissioners to call and to hold a special election to fill the unexpired term. The commissioners advertised and held the election.

The Court upheld the validity of the election and called attention to the fact that the vote cast in the election for District Attorney General was higher than that in any other office subject to election on that day except for the candidates for sheriff and observed that "there can be no question but that the people had adequate notice of the election and that there was a full expression therein by the people." The Court continued:

"The vacancy was a matter of public knowledge. The election machinery was set up. It can make little difference who started the machinery so long as it functioned properly on a proper occasion."

In the case we are considering no one claiming to act by authority called or ad-

vertised an election; the appellant, Taylor, began a campaign for write-in votes just three days before the election, no votes at all were cast in 49 of the State's 95 counties, and only 4,030 of the more than 668,000 persons who vote in other statewide elections undertook to vote for a Supreme Court Judge.

We hold that there was no election for Judge of the Supreme Court on August 3, 1972. We therefore overrule the appellant Taylor's assignments of error.

The issue now for our consideration is twofold:

(1) Whether or not Sections 17–701 to 17–716, T.C.A., the statutory sections providing for the non-partisan election of judges, are in conflict with Article 6, Section 3 of the Tennessee Constitution and therefore unconstitutional; and

(2) A determination of the rights of the parties under the statute if it is found to be constitutional.

Historically, constitutions have been regarded as providing a permanent framework of government. Customarily, they do not provide the details for exercising governmental power. For obvious reasons they are not intended to establish all the law which, from time to time, may be necessary to meet changing conditions, but only to mark the broad outlines of power.

■ Conflicting provisions of a constitution should be harmonized, if possible, in passing on the intent of the framers. If there should be doubt as to the meaning of language in the constitution or a seeming conflict in its provisions, "it is [the] duty of the court to harmonize such portions and favor the construction which will render every word operative, rather than one which will make some words idle and meaningless." Shelby County v. Hale, 200 Tenn. 503, 292 S.W.2d 745 [1956].

Article 6 in Section 3 and 4 provides that the Judges of the Supreme Court, the Chancery Court and other inferior courts shall be elected by the qualified voters, and that their terms of service shall be for eight years. The schedule to the Constitution of 1870 provides that the officers elected at the general election that year shall hold their offices for the terms provided in the constitution, so that the term that was vacated by the death of Judge Creson, as well as the term of every judge now in office began September 1, 1966, and will expire August 31, 1974.

Article 7, Section 4 is in the following words:

"The election of all officers, and the filling of all vacancies not otherwise directed or provided by this Constitution, shall be made in such manner as the Legislature shall direct."

Article 7, Section 7 provides for the general elections to be held on the first Thursday in August preceding the expiration of the terms of judges and other civil officers. It provides also that "No special election shall be held to fill a vacancy in the office of Judge or District Attorney, but at the time herein fixed for the biennial election of civil officers; and such vacancy shall be filled at the next Biennial election recurring more than thirty days after the vacancy occurs."

This constitutional requirement that members of the Supreme Court shall be elected by the qualified voters of the State is not self-executing. The holding of an election envisions much more than fixing a date when it is to be held and providing that only qualified voters shall participate. Provisions must be made by law for nominating and qualifying of candidates, certification of results and the like. State ex rel. Ferguson v. Superior Ct. of King County, (Washington Sup.Ct.) 140 Wash. 636, 250 P. 66. Such executory details can be provided either in the Constitution itself or left to the Legislature. They are entirely absent from Article 6, Section 3.

In passing Chapter 128, Section 1, Acts of 1871, the Legislature at that early date

conceived Article 7, Section 4 as needing legislative action. That Act, the origin of the appointing power now expressed in Sections 17-712 and 17-713, T.C.A., gave the Governor power to appoint in case of vacancies, circumscribed, consistent with Article 7, Section 5, by the provision that his appointee could never hold beyond the next general election. This Act did no violence to Article 6, Section 3. It merely supplemented it by providing for a temporary appointment to fill a vacancy until the next general election. Thus, the Legislature as authorized by Article 7, Section 4, exercised the authority vested in it to make provision for "the filling of all vacancies not otherwise directed or provided for by this Constitution."

■ Even where the constitutional provision is held to be self-executing the rule is:

"It is to be observed that even in the case of a constitutional provision which is self-executing the legislature may enact legislation to facilitate the exercise of the power directly granted by the constitution; legislation may be enacted to facilitate the operation of such a provision, prescribe a practice to be used for its enforcement, provide a convenient remedy for the protection of the rights secured or the determination thereof, or place reasonable safeguards around the exercise of the right. Stated differently, the rule is that a self-executing provision of the constitution does not necessarily exhaust legislative power on the subject, but any legislation must be in harmony with the constitution and further the exercise of constitutional right and make it more available." 16 Am.Jur.2d, Sec. 95, p. 280.

■ Aside from the interplay of Article 7, Section 4, there is no direct conflict between Article 6, Section 3 and the Act of 1971. The election under the Act is still to be made at the regular election every eight years by the qualified voters of the State

at the next general election. Specific provision is made for the election of the Governor's appointee at the next general election as provided by the Constitution. Article 6, Section 3, makes no provision for notice, nomination and qualification of candidates even where the vacancy occurs shortly before the next general election. The 1971 Act, of course, makes other provisions controlling the election of members of the appellate courts, the most notable and far-reaching of which are that the incumbent shall be required to run on his record and not against an opponent and that the Governor shall appoint from a list of three chosen by the Commission created by the Act.

The purpose of the statute as expressed in its preamble is "to assist the governor in finding and appointing the best qualified persons available for service on the appellate courts of Tennessee and to assist the electorate of Tennessee to elect the best qualified persons to said courts; to insulate the justices and judges of said courts from political influence and pressure; to improve the administration of justice; to enhance the prestige of and respect for the appellate courts by eliminating the necessity of political activities by appellate justices and judges; and to make the appellate courts of Tennessee 'nonpolitical.'"

All of these provisions of the Act, it seems to us, derive from the general powers of the Legislature and, with particular reference to the power to fill vacancies in public office, from the express provisions of Article 7, Section 4 and, since none of them is either directly or by necessary implication contrary to the Constitution, the Act is constitutional and valid.

The Constitution, by Article 6, Sections 3 and 4, requires that the Judges of the Supreme Court and of the inferior courts be elected by the qualified voters. In case of Supreme Court Judges they shall be elected by qualified voters of the State; in case of Judges of the Circuit and Chancery Courts and other inferior courts they

"shall be elected by the qualified voters of the district or circuit to which they are to be assigned."

The attack on the statute providing a non-partisan method of filling vacancies in our appellate courts (Chapter 198 of the Public Acts of 1971, now Sections 17–701 to 17–716, inclusive, T.C.A.) is based entirely on the insistence that the voting provided for in Sections 17–714 and 17–715 is not an election within the requirements of Article 6, Section 3, and Article 7, Section 5, of our Constitution.

The Constitution of Tennessee does not define the words, "elect", "election", or "elected" and we have not found nor have we been referred to any provision of the Constitution or of a statute or to any decision of one of our appellate courts defining these words.

There are three instances in which the Constitution provides for referenda and refers to them as elections:

Art. 2, Sec. 29 provides that the credit of no County, City, or Town shall be given or loaned to or in aid of any person, association or corporation, except upon an *election* to be first held by the qualified voters of such county, city or town, and the as-sent of three-fourths of the votes cast in said *election*. This provision was adopted in 1870.

Art. 11, Sec. 3 includes a new provision with regard to amending the Constitution. The proposed amendment may be submitted to the qualified voters "at an *election*". This is one of the 1953 amendments.

Art. 11, Sec. 9 provides for the ratification of private acts, one of the methods being by "approval in an *election* by a majority of those voting in said *election*," etc. This provision, as we know, originated in 1953.[1]

It seems to us that if the Constitution itself denominates these methods of ratification as elections, it cannot be that Chapter 198 is unconstitutional because the elections therein provided for are limited to approval or disapproval. So are the elections provided in Sections of the Constitution referred to above. This is particularly the case, since Article 7, Section 4 reposes wide discretion in the Legislature with respect to elections and the filling of vacancies.

The District Attorney General and the relator, arguing that Chapter 198 of

1.

*Elections*

| | |
|---|---|
| 5–401—5–406 | "election" to remove county seat. |
| 5–1101—5–1025 | "election" to authorize general obligation bonds. |
| 5–1108—5–1109 | "election" to authorize postwar public works bonds. |
| 6–1519 | "election" to authorize bonds for municipal electric plants. |
| 6–1610 | "election" to authorize municipal public works bonds. |
| 6–1804 | "election" to adopt city manager municipal charter. |
| 6–1808—6–1809 | "election" to surrender city manager charter. |
| 6–2907 | "election" to authorize industrial building bonds. |
| 6–3006 | "election" to adopt city manager-council charter. |
| 6–3120—6–3121 | recall "election" to recall councilmen under that charter. |
| 6–3422 | "election" to authorize certain municipal bonds. |
| 65–705—65–709 | "election" to authorize subscription for railroad stock. |
| 67–3053 | "election" to authorize local sales tax. |

the Public Acts of 1971 is invalid, insist that the act is unconstitutional because the Appellate Court Nominating Commission therein provided for is to consist in part of three members of the General Assembly, elected by the General Assembly in joint session. (Sec. 2, Subsec. 3, Ch. 198, Pub. Acts of 1971; Sec. 17–702(3), T.C.A.) They contend that this provision violates Article 2, Sec. 10 of the Tennessee Constitution which includes this prohibition:

"No Senator or Representative shall, during the time for which he was elected, be eligible to any office or place of trust, the appointment to which is vested in the Executive or the General Assembly, except to the office of trustee of a literary institution."

In State ex rel. Carey v. Bratton, 148 Tenn. 174, 253 S.W. 705 [1923], the Court adjudged that the election by the General Assembly of one of its members to a place on the State Election Commission was void. The Court said:

"An 'office' is a public charge or employment, the duties of which are prescribed by law, and he who performs the duties is an officer. Day v. Sharp, 128 Tenn. [340], 346, 161 S.W. 994; 29 Cyc. 1361–1367.

"Positions which by article 2, § 10, of the Constitution legislators are forbidden to hold, are such as impose duties prescribed by law, and not by contract. Lewis v. Watkins, 3 Lea [174], 183; U. S. v. Maurice, Fed.Cas.No. 15, 747, 2 Brock. [96], 102."

Membership on the Appellate Court Nominating Commission is an office or place of trust within the meaning of Art. 2, Sec. 10 of the Constitution and the act of the General Assembly in electing three of its members to the Commission was void.

■ Since the act provides for the election of the legislative members of the Commission by a method that is unconsti-

tutional then that part of the act requiring such election is unconstitutional and void; but Section 18 of the Act in express terms provides that "if any of its sections, provisions, exceptions, sentences, clauses, phrases, or parts thereof be held unconstitutional, void and/or invalid, the remainder of the act shall continue in full force and effect, it being the legislative intent now hereby declared that this act would have been passed even if such unconstitutional, void and/or invalid provision had not been included therein."

The General Assembly having thus declared that if any section of the statute should be unconstitutional and void the remainder of it should continue in full force and effect, and it appearing to us that the portion remaining is complete in itself and capable of being executed wholly independent of Section 2, Subsection 3, we elide that section and adjudge that the statute was not rendered void because of the inclusion in it of that unconstitutional part. Davidson County v. Elrod, 191 Tenn. 109, 232 S.W.2d 1 [1950].

We conclude that Chapter 198 of the Public Acts of 1971, codified as Sections 17–701 to 17–716, inclusive, T.C.A., with the exception of Subsection 3 of Section 2 of Chapter 198 [paragraph (3) of Section 17–702, T.C.A.] is not in conflict with the provisions of the Constitution of our State.

■ The appellant, Turley, has assigned the following errors in support of his contention that he is entitled to fill the vacancy:

(1) "The Chancellor erred in holding that the appointment of the defendant Thomas F. Turley, Jr. as Associate Justice of the Supreme Court and the commission issued relative thereto, was invalid."

(2) "The Court below erred in relying on and applying the provisions of T. C.A. Sec. 17–112 to the case at bar."

(3) "The Chancellor erred in holding and ruling that the Governor's power of

appointment to fill such a vacancy as the one before the Court was limited to the period between the date of the vacancy which occurs thirty days prior to the next general election and the last day of August next following that election."

(4) "It was error for the Court below to hold that the vacancy which the Governor attempted to fill was created by his own improper action."

The first assignment is general and challenges the conclusions the Chancellor reached with regard to this appellant's contentions. It is necessary that we first consider his other assignments.

Judge Creson's term of office would have expired August 31, 1974. His death occurred more than thirty days before the August election. This circumstance made it necessary that the vacancy be treated as having two parts, to be filled in two ways: (1) that part ending August 31, 1972, which the law directed to be filled by the Governor's appointment, and (2) that part beginning September 1, 1972, and ending August 31, 1974, which could be filled in no way other than by election. The enactment of Chapter 198 provided that the Governor should make his appointments to fill vacancies in the appellate courts only from lists of eligible persons submitted by the nominating commission. It did not undertake to grant to the Governor the authority to appoint for a term beginning the following September first when the vacancy occurs more than thirty days before the biennial August election. On the contrary, Section 17–712 (2) provides:

"The terms of all justices or judges appointed under this act shall expire August 31 following the next August biennial general election recurring more than thirty (30) days after the vacancy."

The Governor made no appointment to fill that part of the term expiring August 31, 1972. He had the authority to make the appointment but did not exercise that authority. He appointed Mr. Turley to that part of the term beginning September 1, 1972, and by the express terms of Section 17–712(2) the peroid to which the Governor could appoint him already had expired before his attempted appointment became effective.

■ Mr. Turley assigns as error the Chancellor's holding that the Governor's power of appointment to fill the vacancy that existed was limited to that part of the term that expired on August 31, 1972, insisting that Section 17–112, T.C.A., was repealed by Section 17 of Chapter 198 of the Public Acts of 1971, which provides:

"All laws or parts of laws in conflict with the provisions of this act but not limited to portions of T.C.A. Section 8–1804, T.C.A. Section 17–112, and T.C.A. Section 2–102, are hereby repealed."

This assignment must be overruled, because there is no conflict between Chapter 198 and Section 17–112, T.C.A. Chapter 198 imposes conditions upon the Governor's power to appoint but does not affect the term for which he can appoint. Section 17–112, T.C.A., is repealed by Chapter 198 only to the extent that the terms of the two statutes may come into conflict.

We hold that the Governor was without power to appoint Mr. Turley to the term to which he appointed him. We therefore overrule his assignments of error and dismiss his appeal.

We overrule the assignments of error of the appellants. The decree will be pronounced in accordance with this opinion.

CHATTIN, J., and McAMIS and WILSON, Special Justices, concur.

HUMPHREYS, J., dissents.

DYER, J., did not participate.

HUMPHREYS, Justice (dissenting).

I take advantage of the petitions to rehear by all the parties to edit my original

dissent. This I do by withdrawing the original dissent and filing this one in its place. I concur in the result of much of the majority opinion. So, for the sake of brevity, I shall only mention that part from which I dissent.

I dissent from the redefinition of a constitutionally mandated election to permit only a referendum, so that no one can run in the August election except the appointee.

I dissent from the holding that no member of the General Assembly can serve on the nomination commission.

To the extent that the Modified Missouri Plan provides for the selection of possible appointees by a commission, it is constitutional under Article 7, § 4 of the Constitution of Tennessee which provides, "The election of all officers and the filling of all vacancies not otherwise directed or provided by this Constitution, shall be made in such manner as the Legislature shall direct."

This part of the plan is a vast improvement over anything we have had, and since the entirely unnecessary exclusion of legislators from such a commission jeopardizes this arrangement, I must dissent.

My dissent from the holding that no member of the Legislature can serve on this commission is based on the simple proposition that, since the manner of filling vacancies is expressly entrusted entirely to the Legislature by Article 7, § 4 of the Constitution, and so is legislative business, legislators can serve on the commission without violating Article 2, § 10. Article 2, § 10 provides that "/n/o Senator or Representative shall, during the time for which he was elected, be eligible to any office or place of trust, the appointment to which is vested in the Executive or the General Assembly except to the office of trustee of a literary institution." It would seem to be clear that Article 2, § 10, applies to offices that are not legislative, and not to commissions that are designed to carry out legislative business. Since Article 7, § 4

of the Constitution declares that power to fill vacancies on this Court is peculiarly the business of the Legislature, it is difficult to conceive how Article 2, § 10 prohibits this. Suppose the Legislature had provided for a commission of nine of its own members to recommend appointees to the Governor, could it be said that this commission would be unconstitutionally constituted? Suppose it had passed a law whereby it filled vacancies, would this be unconstitutional? The answer must be in the negative. Then, how can it be that three members of the Legislature cannot serve on such a commission?

The majority opinion cites State ex rel. Carey v. Bratton, 148 Tenn. 174, 253 S.W. 705 (1923), as authority for invalidating legislator membership on the commission. This case is not in point. It involved a legislator appointed to serve on the State Election Commission. There is nothing in the Constitution that delegates to the Legislature the business of running state elections. So, it was entirely reasonable that this Court would apply Article 2, § 10 to the appointment. The present case presents an altogether different question.

If I am not clearly right about this, there is at least enough doubt to make the principle of Wallace v. Grubb, 154 Tenn. 655, 289 S.W. 530 applicable. That case declares that Article 2, § 10 should be narrowly construed so as to uphold the eligibility of the appointee whenever possible. Under this case, a legislator should not be removed from the commission.

If this part of the Plan is unconstitutional, the balance of it cannot be saved by the doctrine of elision. It is fundamental that the whole statute must fall if the part held unconstitutional is so connected with the statutory scheme, and such an indispensable part thereof, that it is not likely the Legislature would have enacted the act without the elided provision. This proposition is spelled out in a number of cases which can be found in 17 Tenn.Digest Statutes, § 64(1). For example, in Hey-

mann v. Hamilton National Bank, 151 Tenn. 21, 266 S.W. 1043, this Court said that elision is not permissible if the result attained defeats the evident legislative intent.

Since the evident legislative intent was to create a commission representative of the legislative, judicial and executive interests in the process of nominating appellate and Supreme Court judges, any act of elision by this Court which leaves such a commission unrepresentative of one of these three major interests, leaves an act which is presumptively inconsistent with the legislative intent.

The part of the Plan that does away with the popular election of judges, and substitutes a recall election, is so obviously contrary to the arrangement in our Constitution, as presently written, for the people to have the right both to *nominate* and *elect* their constitutional officers, that it is difficult to explain why it is unconstitutional. How do you explain the obvious? All you can do is to point out the plain clear words of the Constitution and say, "read it, and follow it".

Article 6, § 3 provides "The Judges of the Supreme Court shall be elected by the qualified voters of the State". Judges as well as other civil officers contemplated by the Constitution are to be elected as provided for by Article 7, § 5 of our Constitution. This section says in part "Elections for Judicial and other civil officers shall be held . . .", and then goes on to say that they shall be held on the first Thursday in August next preceding the expiration of their respective terms of service. This section of the Constitution fixes the day for computing the term of office of all state judicial and civil officers, and clearly contemplates one general popular election to be held on the day fixed for all those in office whose terms expire on August 31.

Ever since the adoption of our first constitution in 1796, the election of constitutional and civil officers has been by popular vote, in elections in which the people have had the right to nominate their candidates and elect their officers; elections in which people have had the right to do as Judge Taylor did, to run without nomination. Now, the majority says that the Legislature can abolish this once constitutional right to choose and elect judges by redefining the provision so as not to require popular elections, but to permit these officials, once they get in office by appointment, to remain there until some undefined percent of the electorate votes to recall them.

I say indefinite percentage, because, although the determination of a popular election has always been on the basis of the candidate who received the most votes, this is not true of recall referendums. Recalls, not pitting one candidate against another, are not based on who gets the most votes, but upon a percentage fixed in the law under which the referendum is held. The Constitution does not fix this percentage. The percentage is not implied by the nature of the referendum as in a popular election. This leaves the Legislature free to fix the percentage as it chooses.

As important, and potentially troublesome as it is, nothing is said in the majority opinion about the effect of this holding on the election of civil officers. Article 7, § 5 not only provides for the election of judges, it provides for the election of all civil officers referred to in the Constitution. Having said Article 7, § 5 can mean no more popular elections for judges, this of course means that the Legislature can do away with popular elections for civil officers. This means that the Legislature can constitutionally keep all constitutional civil officers in office until they are recalled by a percentum of the vote the Legislature chooses to fix.

I do not suggest that the Legislature would be so irresponsible as to do this. I simply point out that the majority in providing for judges (whose offices, I agree, should be depoliticalized to the greatest extent possible), has had to free constitutional

·civil officers from the requirement of popular election, because judges and civil officers are both dealt with in the same article and section, and for that matter in the same sentence, in the Constitution.

It is not necessary for me to dwell on the possible chaotic consequences of the construction placed on Article 7, § 5, by the majority; and this is not, necessarily, the point. The point is that by redefining Article 7, § 5 to permit judges and civil officers to remain in office until recalled, the whole purpose and intent of the Constitution to have government by popular elections has been destroyed.

The Constitution of Tennessee, Article 2, § 1, declares that the powers of government shall be divided into three distinct departments: the Legislative, Executive and Judicial. § 2 of Article 2, declares that no person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except as permitted by the Constitution.

The very existence of constitutional government depends upon the preservation of this arrangement. It is so important that nothing should ever be done that would impair it.

As long as each of these branches of government was answerable alone to the people it could maintain its independence, and thus continue inviolate and in perpetuity the grand constitutional scheme. But now the deadly serious question that arises is, whether, since the constitutional plan for election of one of these branches of government by the people, and the plan for the election of all civil officers by the people, has been held to be within the power of the Legislature, both the other branches of government are in jeopardy. Because, if the provision for the election of Supreme Court judges and all other judges, and all constitutional civil officers, can be read as requiring only a recall election, *what is* to prevent the provisions in Article 2, for the election of representatives and

senators, and the provisions of Article 6, § 5, for the election of district attorneys general from being construed in the same way. Virtually the same language is used in each instance. The election that is contemplated in these sections of the Constitution is no more defined than that provided for judges and civil officers. So, if "elections" by the qualified voters in Articles 6 and 7, mean a recall referendum, then, of course, it can mean recall referendums in the Articles providing for the election of representatives, senators, district attorneys general, and all other civil officers.

It is not enough to say that this may not happen. The fact that it is possible is enough to condemn the Plan.

Let me say in conclusion that I dissent from the majority opinion for the further reason that, by turning over to the Legislature the right to say how Supreme Court Judges shall be chosen, this Supreme Court abdicates its place as a coequal part of our tripartite state government, and subordinates itself to the Legislature. Of this subordination, there can be no doubt. Where once the Constitution protected this Court, and preserved it, it must now take its chances with the Legislature. Today the Plan provides for recall by majority vote. But this is only statutory, so what is to keep the· Legislature from providing for recall by a different percentage. For that matter, what is to keep it from saying that a judge must be approved by an affirmative vote of such a percentage as will empty the Bench of presently serving judges? If all of this is truly within the power of the Legislature, there is nothing to save this Court.

We are today witnessing a sad consequence of this subordination of this Supreme Court to the Legislature. Judicial notice can be taken of the fact that a bill has been introduced in the Legislature to repeal the Modified Missouri Plan. This bill may be defeated. But, that need not be the end of it. Another bill can be introduced next session, or the session after

that, ad infinitum, so that Supreme Court Judges and, possibly, all judges, can be kept in attendance by the Legislature, hat in hand, so to speak, whenever it suits the purpose of some disgruntled representatives to snap the Court to attention with a bill to change the manner of their election. If this is not subordination, nothing is. If this is not more political than election by the people, nothing is. Have we not, like Esau, sold our precious birthright, equality and freedom for a mess of potage, a cheap, easy way to be perpetuated in office? I say this Court has opened Pandora's Box, and, that although the evils locked up therein may not surface immediately, and in fact may never surface, there is no longer any constitutional guarantee that they cannot, as was the case before the majority opinion was written.

## OPINION ON PETITION TO REHEAR

McCANLESS, Justice.

In this cause the Attorney General and Reporter has filed his petition to rehear, seeking a clarification of the Court's majority opinion, filed March 19, 1973, insisting that that opinion leaves undetermined the manner in which the existing vacancy on the Supreme Court is to be filled. This is not a correct understanding of our opinion. We grant the petition to rehear in order to explain and clarify this feature of it.

We held that there was no election as the Constitution requires for that part of the term that began on September 1, 1972. The vacancy exists. We also held valid Chapter 198 of the Public Acts of 1971 (Sections 17–701 to 17–716, inclusive, Tennessee Code Annotated), the statute under the authority of which vacancies on the Supreme Court must be filled.

Nothing in our opinion was intended to prevent the Governor from now giving notice to the Appellate Court Nominating Commission of the existence of the vacancy caused by the death of Justice Creson and receiving nominees therefrom all as provided by Chapter 198 of the Public Acts of 1971.

CHATTIN, J., and McAMIS and WILSON, Special Justices, concur.

## ON PETITION TO REHEAR

McCANLESS, Justice.

Defendant Taylor has filed a petition to rehear. It points out no decisive matter of law or fact overlooked, but argues matters which this defendant insists were improperly decided.

"The office of a petition to rehear is to call the attention of the court to matters overlooked, not those things which counsel supposes were improperly decided after full consideration." West v. Carr, 212 Tenn. 367, 370 S.W.2d 469 [1963].

The petition is denied.

CHATTIN, J., and McAMIS and WILSON, Special Justices, concur.

DYER, C. J., not participating.

## ON PETITION TO REHEAR

McCANLESS, Justice.

Defendant Turley has filed an earnest petition to rehear. He insists we misconstrued and misapplied T.C.A. Section 17–712(2). We disagree.

At the time the Governor appointed Turley by constitutional mandate he could only appoint him subject to the election of August 3, 1972. Article 7, Section 5, Constitution of Tennessee.

To construe and apply T.C.A. Section 17–712(2), as insisted by this defendant, would amount to an unconstitutional application of that Section.

The petition is denied.

CHATTIN, J., and McAMIS and WILSON, Special Justices, concur.

DYER, C. J., not participating.

HUMPHREYS, Justice (dissenting on rehearing).

While maintaining my dissent, I agree, as insisted by the petition to rehear filed by the Attorney General, that there is now nothing to bar the implementation of the Plan to fill the existing vacancy on this Court. My mind is satisfied that the Plan is unconstitutional, but, if we are to operate under it, the vacancy on the Court must be filled under it.

During the argument of this case at Knoxville, and in conference, I expressed the opinion that if neither Mr. Turley nor Mr. Taylor was entitled to the office, and if the Plan was to be upheld, it would be necessary to proceed anew under the Plan, the principle of functus officio so requiring. I am still of that opinion.

Turning to Mr. Turley's petition to rehear: It makes the point that, inasmuch as his appointive term did not commence until September 1, 1972, it could not have expired on August 31, 1972. And, as there is nothing in § 17–712(2) T.C.A., nor in any other provision of the Plan to prohibit the making of the appointment after that date, his appointment is valid. Mr. Turley argues further that if the Plan is valid, so that the whole subject matter is subject to control by the legislature, then his appointment on September 1, 1972 was valid.

Assuming the validity of the Plan, Mr. Turley is, of course, correct. The majority in its original opinion said Mr. Turley's appointment was invalid, because, "by the express terms of § 17–712(2) the period to which the Governor could appoint him (Mr. Turley) already had expired before his attempted appointment became effective."

It is perfectly clear from the statute that, instead of expressly applying to cut off the appointing power on August 31, it expressly applies only to *judges already appointed and serving terms of office,* and Mr. Turley was not in this category. The statute reads as follows:

"17–712(2). The *terms* of all justices or judges *appointed* under this act shall expire August 31 following the next August biennial general election recurring more than thirty (30) days after the vacancy."

How this language affects the power to appoint after September 1, I shall never understand. Proof that it does not is to be found in the majority's rehear opinion, holding that now an appointment can be made.

I concurred in the result reached by the majority that Mr. Turley's appointment was void on the ground that this was required by that part of Article 7, § 5 of the Constitution which provides, "and such vacancy shall be filled at the next Biennial election recurring more than thirty days after the vacancy occurs.", not the statute.

I am compelled to concede, however, that if the clear mandate of our Constitution that Supreme Court Judges shall "be elected by the qualified voters", can be read as authorizing a plan under which the qualified voters never get to elect a Supreme Court Judge, then there is no reason at all not to read § 17–712(2) T.C.A. any way that gets the desired result.

Judge Taylor's original and supplemental petitions to rehear consist largely of reargument of the grounds on which he originally relied. I could not agree with them then, and I cannot agree with them now.

Judge Taylor has, however, placed before the Court portions of the Constitutional Convention of 1870, which make it perfectly clear that before the resolution of the question, whether the Supreme Court should be elected by the qualified voters of the State or be appointed as are federal judges, there was much debate, and that it was finally decided that Supreme Court

judges should be elected by the qualified voters. All of this discussion was summarized in Article 6, § 3 of the Constitution, where it declares "The Judges of the Supreme Court shall be elected by the qualified voters of the State." This declaration of the manner of choosing Supreme Court Judges is so plain and clear that it does not require support by historical references, as relevant as these references are. If the plain command is going to be ignored, there is no reason to hope the discussion giving rise to the command will be noticed.

Hopeless, though the offering of the history was, I thank Mr. Taylor for placing it before the Court.