John Jay HOOKER et al.

v.

Governor Bill HASLAM et al.

Supreme Court of Tennessee.
at Nashville.

July 27, 2012.

## ORDER

PER CURIAM.

On February 21, 2012, John Jay Hooker filed this declaratory judgment suit in the Circuit Court for Davidson County naming as defendants the Governor, the Chief Justice, the Speakers of the House and Senate, the Chair of the House and Senate Judiciary Committees, the Attorney General, and Judge Jeffrey S. Bivins, challenging the gubernatorial appointment of Judge Bivins to the Court of Criminal Appeals under Tennessee Code Annotated sections 17–4–101 through 17–4–119 (2009) (the "Tennessee Plan") and asserting that the impending August 2, 2012 retention election violates article VI, sections 3 and 4 of the Tennessee Constitution. Describing himself as a "retired lawyer, who upon request to the Tennessee Board of Professional Responsibility, has the unfettered right upon application to renew his law license," Mr. Hooker, who made this claim on his own behalf and purportedly on behalf of "all other qualified lawyers who have a right to be candidates for the seat occupied by Judge Biv[i]ns," further sought an injunction as to "any further retention elections under the [A]ct." Because Mr. Hooker had filed previous suits in the state and federal courts alleging the same grounds for relief, the State sought a

dismissal based upon res judicata. Recognizing that challenges to the Tennessee Plan had been previously rejected in both the state and federal courts, the trial court denied relief, holding in pertinent part as follows:

> [Beginning] with *State by Shriver ex rel. Higgins v. Dunn*, 496 S.W.2d 480 (Tenn. 1973), . . . cases and the judgments of . . . previous courts, especially the Supreme Court of Tennessee, but also [f]ederal [d]istrict [c]ourts and other Tennessee "inferior" courts, involve the same issues, and the same parties in privies, and the prior declarations and judgments, collectively, and are binding upon th[is] court on the doctrine of stare decisis . . . [A]s a matter of law . . . the Tennessee [r]etention [e]lection [s]tatute, hereinafter termed the Tennessee Plan, is constitutional for both the Supreme Court and the Court of Criminal Appeals and . . . [the Court of] Appeals.

## I.

Mr. Hooker filed a notice of appeal in the Court of Appeals on June 21, 2012, and, at the same time, asked this Court to exercise its discretionary authority to "reach down" for the case pursuant to Tennessee Code Annotated section 16–3–201(d)(1) (2009 & Supp.2011), a statute authorizing us to "assume jurisdiction over an undecided case in which a notice of appeal . . . is filed before any intermediate state appellate court." As a part of the request to assume jurisdiction, however, Mr. Hooker, alleging as grounds the "economic interests" of each of the sitting justices, sought the recusal of all justices under the provisions of article VI, section 11 of the Tennessee Constitution, which provides as follows:

> *No Judge of the Supreme* or ˙Inferior Courts *shall preside on the trial of any cause in the event of which he may be interested,* or where either of the parties shall be connected with him by affinity or consanguinity, within such degrees as may be prescribed by law, or in which he may have been of counsel, or in which he may have presided in any inferior Court, except by consent of all the parties. *In case all or any of the Judges of the Supreme Court shall thus be disqualified from presiding on the trial of any cause or causes, the Court, or the Judges thereof, shall certify the same to the Governor of the State, and he shall forthwith specially commission the requisite number of men, of law knowledge, for the trial and determination thereof. The Legislature may by general laws make provision that special Judges may be appointed,* to hold any Courts the Judge of which shall be unable or fail to attend or sit; or to hear any cause in which the Judge may be incompetent.[1]

Tenn. Const. art. VI, § 11 (emphasis added).

In response, the State asserted that Mr. Hooker's motion was premature because the suit was pending in the Court of Appeals and because recusal was not required based upon our language in *In re Hooker*, 340 S.W.3d 389 (Tenn.2011). Meanwhile, the Court of Appeals expedited the appellate process. In an apparent ef-

---

1. In *Hooker v. Sundquist*, No. 01A01–9709–CH–00533, 1999 WL 74545, at *3 (Tenn. Feb. 16, 1999), a case in which Mr. Hooker sought recusal based on alleged conflicts of interest and challenged the authority of the Chief Justice to appoint replacement judges, the Supreme Court considered the provisions of Tennessee Code Annotated section 17–2–104 (2009) (enabling the Governor to appoint supreme court justices in the event of illness) and Tennessee Code Annotated section 17–2–110 (2009) (authorizing the Chief Justice to appoint replacement judges) and concluded that the Legislature had authorized both the Governor and the Chief Justice to designate temporary judges.

fort to resolve the issue prior to the August 2, 2012 election, the Court of Appeals entered a scheduling order dated July 10, 2012, which provided as follows:

1) The appellant's brief shall be filed on or before July 17, 2012;

2) The appellees' brief shall be filed on or before July 24, 2012;

3) Oral argument shall be heard on July 30, 2012, at 9:00 AM in Nashville.

On July 16, 2012, Chief Justice Cornelia A. Clark, as a named defendant in this litigation, entered an order of recusal. On the same date, Justice William C. Koch, Jr., who, as a judge of the Court of Appeals, had chosen not to participate in a 1996 suit attacking the constitutionality of the Tennessee Plan in regard to the vacancy created by the retirement of his colleague, Court of Appeals' Presiding Judge Henry Todd, see *DeLaney v. Thompson,* 982 S.W.2d 857, 860 (Tenn.1998) (noting that a Special Court of Appeals had been appointed to hear the case), also entered an order of recusal. Immediately afterward, this Court, absent the participation of the Chief Justice and Justice Koch, requested briefing by both Mr. Hooker and the State on the issue of recusal in an effort to determine the propriety, under these circumstances, of our consideration of the motion to assume jurisdiction. Mindful that the Court of Appeals had scheduled this case for argument on July 30, 2012, this Court set a briefing deadline for both sides of July 26, 2012, as to the issue of recusal.

Instead of providing an argument of law as directed by the Court, Mr. Hooker has chosen to file a "Response and Motions," relying upon his claim that the remaining members of the Court, because of their "economic interest" in their offices, must recuse, and insisting that the "document be filed in lieu of a brief." On July 19, Mr. Hooker filed an "Amended Response and Motions," demanding that the "economic interests" of the members of the Court in their respective offices required disqualification "without delay," but refused to brief the issues contained in the order. On July 26, 2012, the State filed a brief, as directed, that addressed the question of recusal. After asserting that the recently adopted Supreme Court Rule 10B did not apply, the State argued in pertinent part, as follows:

> Under [the reach-down] statute, the Court's ... authority applies "only to cases of unusual public importance" having a "special need for expedited decision." Tenn.Code Ann. § 16–3–201(d)(2)....
>
> The issue ... for [Mr. Hooker's] reach-down motion involves the "districts" in which judges of the Court of Appeals and Court of Criminal Appeals are elected—it does not involve the manner in which justices of *this* Court are elected. *See* June 21, 2012 Motion to Recuse, at 5–6 ("The claim in [this] case is that the Retention Election Statute is unconstitutional in that it provides that Court of Appeals Judges, both civil and criminal, shall be elected by 'qualified voters of the State' on a county-by-county basis, ... [w]hereas the Constitution provides under [a]rticle VI, [s]ection 4 that the Judges of the Court of Appeals shall be elected by the 'qualified voters of the State' in the District to which they have been 'assigned' ..."). The issue of "unusual public importance" that [Mr. Hooker] says this case presents for purposes of Tenn.Code Ann. § 16–3–201(d), therefore, is not one in which any member of this Court has an interest, economic or otherwise.
>
> [Mr. Hooker] ... alleges that the election of intermediate appellate court judges by retention election violates the requirement of [a]rticle VI, [s]ection 4 of

the Tennessee Constitution that judges of other inferior courts be "elected." This, of course, is the same requirement that applies to judges of the Supreme Court in [a]rticle VI, section 3. [Mr. Hooker] has previously asserted this argument unsuccessfully six times in both state and federal court, and the trial court below properly found that the claim in this case is barred by *stare decisis*.

[Mr. Hooker] has not identified these allegations as a basis for his reach-down motion, and for good reason. The constitutionality of retention elections *cannot* be the subject of such a motion because it *cannot* be an issue of unusual importance needing expedited Supreme Court review precisely because it has been previously decided by [prior] Supreme Court[s]. . . .

Accordingly, the sole issue before the Court is whether the justices should recuse themselves from deciding a reach-down motion premised on the "unusual public importance" of whether intermediate appellate court judges should be elected from districts rather than state-wide. No justice has a disqualifying interest in that issue. Accordingly, the motion for recusal should be denied.

(Footnote omitted) (citation omitted).

Mr. Hooker filed a lengthy response on July 26, 2012, reiterating his claims.

## II.

■■■ A threshold issue is which standard of recusal applies to these circumstances. Mr. Hooker sought recusal on June 21, 2012. By order filed January 4, 2012, this Court adopted Supreme Court Rule 10B, effective on July 1, 2012.[2] The comments provide that the rule "shall have prospective application only, applying to all motions for disqualification or recusal filed on or after that date." Tenn. Sup.Ct. R. 10B, § 3.03, Compiler's Notes. Because Mr. Hooker's motion was filed prior to the effective date of the rule, the previous standard governing disqualification applies, as set out below:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it[;]

(c) *the judge knows that he or she individually* or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, *has an economic interest in the subject matter in controversy* or in a party to the proceeding or has any other more than de

---

2. Tennessee Supreme Court Rule 10B, section 3.03 provides as follows:

If a motion is filed seeking disqualification, recusal, or determination of constitutional or statutory incompetence of a Supreme Court justice, the justice in question shall act promptly by written order and either grant or deny the motion. If the motion is denied, the justice shall state in writing the grounds upon which he or she denies the motion. If the justice denies the motion, the movant, within fifteen days of entry of the order, may file a motion for court review, which shall be determined promptly by the remaining justices upon a de novo standard of review.

minimis interest that could be substantially affected by the proceeding; (d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) A judge shall keep informed about the judge's personal, fiduciary, and economic interests, and make a reasonable effort to keep informed about the personal economic interests of the judge's spouse and minor children residing in the judge's household.

Tenn. Sup.Ct. R. 10, Canon 3(E) (2011) (emphasis added). Although recusal under this rule is discretionary, an objective standard applies. *State v. Cannon,* 254 S.W.3d 287, 307 (Tenn.2008); *Davis v. Liberty Mut. Ins. Co.,* 38 S.W.3d 560, 565 (Tenn. 2001). A disqualification is required " 'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.' " *Cannon,* 254 S.W.3d at 307 (quoting *Davis,* 38 S.W.3d at 564). A litigant has the fundamental right to have a case heard and decided by fair and impartial judges. *Bean v. Bailey,* 280 S.W.3d 798, 803 (Tenn.2009).

### III.

The core issue is whether Mr. Hooker is entitled to be a candidate for the position

Judge Bivins holds with the Court of Criminal Appeals in the August 2, 2012 election on the basis that retention elections violate the terms of our state constitution. Because the same provision applies to the Tennessee Supreme Court, the members of which are elected under the same legislation, Mr. Hooker maintains that our ethical obligations require recusal.

The constitutionality of the Tennessee Plan has a long and storied history in the state and federal courts. Mr. Hooker's participation in much of the litigation is well documented. In an order entered on February 25, 2011, this Court identified a variety of suits on this and other subjects spanning over two decades that had been filed against "over ninety different defendants in these suits, including two Presidents of the United States, ten United States Senators, four Governors, four Tennessee Attorneys General, eight Tennessee Supreme Court Justices, ten Tennessee Court of Appeals Judges, the Lieutenant Governor, the Speaker of the House, and twenty-one candidates for various offices." *In re Hooker,* 340 S.W.3d at 391. This litigation, of course, adds to the list of individuals made defendants in what in each instance has turned out to be a meritless claim for relief. Furthermore, when Mr. Hooker did not prevail in the claims he made in the trial and appellate courts, as we observed in *In re Hooker,* he

began challenging the authority of the state appellate courts to hear and decide his claims because he believed that the judges were not validly elected.... [and] [w]hen these challenges [also] did not succeed, [he] began to accuse the trial and appellate judges who had considered and rejected his claims of engaging in unethical and criminal misconduct.

*Id.* at 391.

█ Mr. Hooker's original motion in this litigation seeking the recusal of the

members of this Court because of a faulty election process serves as partial confirmation of this Court's assessment in *In re Hooker*. His "Response and Motions" to our request for briefing, alleging that any failure to recuse will subject the member of the Court to "indictment by the grand jury," "suit ... under 42 USC 1983," and other sanctions, serves as confirmation of his inclination to accuse judges of gross improprieties should they dare rule contrary to his claim. To illustrate, a few years ago, a Davidson County Circuit Judge, after characterizing Mr. Hooker as "an unrepentant ... litigant who files frivolous lawsuits on top of frivolous lawsuits using the most baseless invectives," established a screening mechanism in an effort to curtail any possible misuse of the trial courts. *Hooker v. Crawford*, No. M2005–00052–COA–R3–CV, 2006 WL 140379, at *2 (Tenn.Ct.App. Jan. 17, 2006), *perm. app. denied* Sept. 5, 2006. The Court of Appeals, recognizing the need to ensure that the dockets of the trial courts would not be "glutted by repeated frivolous filings," upheld the screening mechanism as a reasonable effort to protect the public

interest by limiting the time and expense involved in addressing issues which had already been litigated and ruled upon in prior instances. *In re Hooker*, 340 S.W.3d at 392. Mr. Hooker's response was to file "an invective-laden complaint in the Circuit Court for Davidson County seeking $3 million in punitive damages from the circuit court judge who imposed the screening mechanism and from each of the three Court of Appeals judges who upheld the screening mechanism." *Id.* The suit was dismissed. *Id.*[3]

As indicated, the trial court ruled in this case that Mr. Hooker's claims had been addressed by the Tennessee Supreme Court on at least two prior occasions. First, in 1973, the Supreme Court, as then constituted, unequivocally determined that the General Assembly's adoption of the statute providing for the retention election of appellate judges was compliant with our state constitution. *State by Shriver ex rel. Higgins v. Dunn*, 496 S.W.2d 480, 487–89 (Tenn.1973).[4] Writing on behalf of the majority, Justice McCanless considered and rejected the claim that article VI, sec-

---

3. First, there are and should be safeguards against persistently unsuccessful litigants who insist upon recusal after suing the judges from whom they have failed to gain relief. In *Kennedy v. Staples*, 336 S.W.3d 745, 747 (Tex. App.2011), for example, a prison inmate sued, among others, every judge in a judicial district and the entire Court of Criminal Appeals for alleged civil rights violations. When his suit was dismissed for his failure to assert a colorable claim, he appealed, contending the trial judge should have entered an order of recusal. *Id.* The Texas Court of Appeals, after reciting the inmate's long history of unsuccessful appeals, held that the trial judge, even though "interested" as a defendant in the suit, was entitled to preside given the lack of "a real, colorable claim for damages." *Id.* at 751. The court further ruled that "Kennedy apparently thinks he has discovered how to manipulate the system to obtain a substitute judge—from a different region or county— one presumably more to his liking, both at the

trial and appellate level." *Id.* As noted in the Kennedy opinion, courts have the "inherent judicial power to exercise their jurisdiction, to administer justice, and to preserve their independence and integrity." *Id.; see also Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex.1979).

4. Justice McCanless delivered the opinion of the Court, in which Justices Chattin and Special Justices John W. Wilson and Luke McAmis (who retired September 5, 1970, as the Presiding Judge of the Court of Appeals) joined. Justice Humphreys filed a dissenting opinion. *Dunn*, 496 S.W.2d at 491 (Humphreys, J., dissenting). The suit addressed competing claims for the vacancy on the Supreme Court by Thomas F. Turley, Jr., who was approved by Governor Dunn, and Robert L. Taylor, who claimed to have been validly elected. *Id.* at 481.

tion 3 of the Tennessee Constitution, which required that the members of the Supreme Court "shall be elected by the qualified voters of the state," could only mean that the offices must be filled by contested, partisan elections. *Id.* at 489. The Court, recognizing the wide latitude vested in the General Assembly to establish the means of selection for Tennessee's appellate courts, declared as "constitutional and valid" legislation providing for retention elections. *Id.* at 488. As to the claim that the constitution required a more narrow interpretation, Justice McCanless pointed to article II, section 29, which used nearly identical language to provide for a yes or no "election ... by the qualified voters." *Id.* at 489 (emphasis omitted).

In 1996, Mr. Hooker mounted the second challenge to the constitutionality of retention elections, arguing that Justice Penny J. White, who had been appointed to the Supreme Court in 1994 by Governor Ned McWherter, was not entitled to be the only candidate on the August 1, 1996 ballot. *State ex rel. Hooker v. Thompson*, 249 S.W.3d 331, 333 (Tenn.1996).[5] Although Mr. Hooker sought a nominating petition so as to be able to run for the position, the primary issue was once again whether the retention election of appellate judges, as established by the General Assembly under the Tennessee Plan, violated article VI, section 3, which required the members of the Supreme Court to be "elected by the qualified voters" of the state. *Id.* at 337. When the sitting justices entered orders of recusal, Governor Don Sundquist appointed a Special Supreme Court made up of former Chief Justice William H.D. Fones and other special justices Martha S.L.

Black, S. Morris Hadden, Lin S. Howard, and A.C. Wharton, Jr. *Id.* at 335. In recognition of the prerogative of the legislative branch of our state government, the Special Court began by citing the long-standing principle that "laws enacted by the legislature are entitled to a presumption of constitutionality." *Id.* at 337. As in *Higgins v. Dunn*, the Special Court concluded "that the yes/no retention vote provided for in the Tennessee Plan is in compliance with the [a]rticle VI, [s]ection 3 mandate of the Tennessee Constitution that Judges of the Supreme Court be 'elected by the qualified voters,'" commenting that "[n]o authority was cited by any party to these proceedings, nor has any been found by this Court, that would dictate a different result under the United Stated Constitution." *Id.* at 338. The Special Court further found that neither article I, section 5 of the Tennessee Constitution, requiring elections to be "free and equal," nor article II, section 1 of the Tennessee Constitution, providing for the separation of powers among the three branches, were in conflict with the terms of the Tennessee Plan. *Id.* at 338. Shortly after the decision, in *Holder v. Tennessee Judicial Selection Commission*, 937 S.W.2d 877, 879 (Tenn.1996), the Court, then consisting of Chief Justice A.A. Birch and Justices Frank Drowota, E. Riley Anderson, and Lyle Reid, acknowledged the holding by the Special Court that the Tennessee Plan met constitutional standards and further ruled that the vacancy created by the defeat of Justice White was open to applicants from both the Eastern and Western Grand Divisions of the State.

5. This case was consolidated with a separate constitutional challenge filed in a different trial court by Lewis L. Laska. Two years later, in *DeLaney v. Thompson*, a Special Supreme Court made up of Special Chief Justice Ames Davis and Special Justices Benjamin Hooks, Gary D. Gerbitz, Robert D. Arnold, and Jeanie M. Todd considered a constitutional challenge to the Tennessee Plan, but a majority of that court dismissed the claim based on non-constitutional grounds. 982 S.W.2d at 861.

These rulings did not satisfy Mr. Hooker's concerns. On March 25, 1998, only two years after his initial challenge, Mr. Hooker filed a suit in Davidson County Chancery Court against various state officials once again seeking a declaration that the Tennessee Plan did not meet constitutional standards. The trial court dismissed the claim. Afterward, a Special Court of Appeals, appointed by Chief Justice E. Riley Anderson, affirmed the judgment in a one sentence order. When Mr. Hooker filed an application for permission to appeal to this Court, a Special Supreme Court appointed by Governor Sundquist ruled as follows: "[t]he application for permission to appeal filed by the petitioner has been considered by the Special Supreme Court, and it is the decision of the Special Court that the application be denied." *Hooker v. Drowota*, No. 98–034–III (Davidson Cnty. Ch. Ct., Mar. 25, 1998).

Unsuccessful in state court, Mr. Hooker then brought suit in federal court, once again challenging the constitutionality of the statute. *Hooker v. Anderson*, No. 3–00–510 (M.D.Tenn. May 26, 2000). As Mr. Hooker stated in his pleadings, "[t]he gravamen of this lawsuit is that the Retention Election deprive[s] the Voter of due process and equal protection of the law ..." The district court dismissed a variety of constitutional challenges and concluded that it had no jurisdiction as to the state constitutional law claims. The Sixth Circuit Court of Appeals affirmed the district court. *See Hooker v. Anderson*, 12 Fed. Appx. 323 (6th Cir.2001).

In 2002, Mr. Hooker again filed suit in federal court naming among others, all five justices on the Tennessee Supreme Court (Justices Frank Drowota, Riley Anderson, Adolpho A. Birch, Jr., Janice A. Holder and William M. Barker) and three members of the Middle Section Court of Appeals (Judges Ben H. Cantrell, William C.

Koch, Jr., and William B. Cain), alleging that all were unconstitutionally elected under the Tennessee Plan in violation of the Tennessee Constitution article VI, section 3. *Hooker v. All Members of the Tenn. Supreme Court*, No. 3–02–0787 (M.D.Tenn. July 28, 2003). On July 28, 2003, the district court ruled that his claims were barred by the doctrine of res judicata.

On August 2, 2006, Mr. Hooker filed another lawsuit in federal court against the Governor; the State Election Coordinator; all of the members of this Court; all of the members of the Western Section Court of Appeals; three of the four members of the Middle Section Court of Appeals; and a state trial court judge for the Twentieth Judicial District—in both their individual and official capacities. *Hooker v. Bredesen*, No. 3–06–0753 (M.D.Tenn. Aug. 2, 2006). Mr. Hooker alleged that the various Tennessee state appellate and trial court judges had violated his right to due process under the Fifth and Fourteenth Amendments of the United States Constitution by failing to recuse themselves in yet another court proceeding. *Id.* Mr. Hooker further alleged that the order of sanctions issued by the state trial court in that pending state court proceeding, which was subsequently upheld by the Western Section Court of Appeals, violated his First Amendment right of access to the courts because he was unable to bring any action in state court to challenge the constitutionality of the Tennessee Plan. After the state claimed res judicata as a bar to his suit, Mr. Hooker voluntarily dismissed his claims and unsuccessfully attempted to intervene in *Bredesen v. Tennessee Judicial Selection Commission*, 214 S.W.3d 419 (Tenn.2007), trying to once again challenge the constitutionality of the Tennessee Plan, *Hooker v. Bredesen*, No. 3:07–0373, 2008 WL 701584 (M.D.Tenn.2008) (consolidated with *Johnson v. Bredesen*, No. 3:07–0372, 2008 WL 701584 (M.D.Tenn.2008)), and

naming members of this Court, among others, as defendants. He claimed that under article VI, section 3 of the Tennessee Constitution, he and other qualified state voters have a "property right" to vote in a popular election rather than in accordance with the Tennessee Plan. On March 13, 2008, the district court dismissed the suit under the doctrine of res judicata since he had previously litigated similar claims and lost. The Sixth Circuit Court of Appeals affirmed. *See Johnson v. Bredesen,* 356 Fed.Appx. 781, 785 (6th Cir.2009).

## IV.

Stare decisis is, of course, among the most important principles of law. It has been described as "a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices. This policy ... is based upon the assumption that certainty, predictability and stability in the law are the major objectives of the legal system." *Moradi–Shalal v. Fireman's Fund Ins. Cos.,* 46 Cal.3d 287, 296, 250 Cal.Rptr. 116, 758 P.2d 58 (1988) (internal quotations marks omitted); *see also In re Estate of McFarland,* 167 S.W.3d 299, 306 (Tenn. 2005) (recognizing that stability in the law permits individuals to "safely judge their legal rights"). Observing that the Latin phrase translated "to stand by things decided," Black's Law Dictionary 1537 (9th ed.2009), describes the doctrine as one "of precedent, under which a court must follow earlier judicial decisions when the same points arise again in litigation." "A cardinal rule ... [is that a] constitution is not to be made to mean one thing at one time, and another at some subsequent time...." *McCulley v. State,* 102 Tenn. 509, 53 S.W. 134, 139–40 (1899). Moreover, the courts are "not composed of judges free to write their personal opinions on public policy into law." *Jordan v. Knox Cnty.,* 213 S.W.3d 751, 780 (Tenn.2007). This doctrine is "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Id.* (internal quotation marks omitted). The 1973 ruling in *Higgins v. Dunn* and that in *Hooker v. Sundquist* some twenty-three years later recognized the expansive powers of the General Assembly to establish the manner of judicial elections. Those rulings clearly qualify as settled law on the constitutionality of retention elections and would typically be entitled to deference under the doctrine of stare decisis.[6]

---

**6.** The State makes a persuasive argument that Mr. Hooker's claims are barred by the doctrine of res judicata, which, precludes "a second suit between the same parties or their privies on the same cause of action with respect to all issues which were or *could have been* litigated in the former suit." *Young v. Barrow,* 130 S.W.3d 59, 64 (Tenn.Ct.App. 2003) (emphasis added); *see also Massengill v. Scott,* 738 S.W.2d 629, 631 (Tenn.1987) (observing that res judicata bars not only claims that have been litigated but also claims that "could have been litigated in the former suit"). The primary purposes of the doctrine are to promote finality in litigation, prevent inconsistent or contradictory judgments, con-serve legal resources, and protect litigants from the cost and vexation of multiple lawsuits. *Sweatt v. Tenn. Dep't of Corr.,* 88 S.W.3d 567, 570 (Tenn.Ct.App.2002): *see also Moulton v. Ford Motor Co.,* 533 S.W.2d 295, 296 (Tenn.1976) ("Res judicata is not based upon any presumption that the final judgment was right or just. Rather, it is justifiable on the broad grounds of public policy which requires an eventual end to litigation."); *Jordan v. Johns,* 168 Tenn. 525, 79 S.W.2d 798, 802 (1935) ("[P]ublic policy dictates that litigation should be determined with reasonable expedition, and not protracted through inattention and lack of diligence on the part of litigants or their counsel."). The doctrine ap-

## V.

Although Mr. Hooker has refused our invitation to supply a supportive brief addressing the issue of recusal, he bases his demands on the theory that the justices of this Court have an "economic interest" in their offices, presumably in the form of salary and benefits similar to that of Judge Bivins. The brief of the State takes a contrary position.

"Economic interest" is defined in the Code of Judicial Conduct as follows:

[O]wnership of more than a de minimis legal or equitable interest. Except for situations in which the judge participates in the management of such a legal or equitable interest, or the interest could be substantially affected by the outcome of a proceeding before a judge, it does not include:

an interest in the individual holdings within a mutual or common investment fund; an interest in securities held by an educational, religious, charitable, fraternal, or civic organization in which the judge or the judge's spouse, domestic partner, parent, or child serves as a director, an officer, an advisor, or other participant; a deposit in a financial institution or deposits or proprietary interests the judge may maintain as a member of a mutual savings association or credit union, or similar proprietary interests; or an interest in the issuer of government securities held by the judge.

Tenn. Sup.Ct. R. 10, Terminology. Although we have been unable to find any Tennessee cases that expand upon what would constitute an "economic interest," cases from other jurisdictions generally deal with situations in which a jurist has a pecuniary interest, such as the ownership of stock in a company that is a party to the litigation.[7] *See, e.g., Huffman v. Ark. Ju-*

---

plies when: (1) a court of competent jurisdiction rendered a prior judgment; (2) the prior judgment was final and on the merits; (3) both proceedings involved the same parties or their privies; and (4) both proceedings involved the same cause of action. *Lee v. Hall,* 790 S.W.2d 293, 294 (Tenn.Ct.App.1990).

Here, the Special Supreme Court in *State ex rel. Hooker v. Thompson,* and the Court of Appeals for the Sixth Circuit in *Hooker v. Anderson,* 12 Fed.Appx. 323 (6th Cir.2001) have rendered prior judgments on Mr. Hooker's challenge to the constitutionality of the Tennessee Plan. *See Mullins v. State,* 294 S.W.3d 529, 537 & n.3 (Tenn.2009) (noting that this Court has recognized that decisions of federal courts are entitled to full faith and credit under Article IV, Section 1 of the federal constitution and, therefore, are entitled to preclusive effect for purposes of res judicata). Secondly, if a judgment on the merits is final, it "resolves all the issues in the case, 'leaving nothing else for the trial court to do.' " *In re Estate of Ridley,* 270 S.W.3d 37, 40 (Tenn. 2008) (quoting *In re Estate of Henderson,* 121 S.W.3d 643, 645 (Tenn.2003)). Thirdly, in an official-capacity suit, the real party in interest is typically the governmental entity and not the named official. *Will v. Mich. Dep't of*

*State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (stating that an official capacity lawsuit is "no different from a suit against the State itself"); *see also Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n,* 15 S.W.3d 434, 438–39 (Tenn.Ct.App.1999). Even though Mr. Hooker in his prior suits named various state officials, privity appears to exist because the real party in interest appears to be the state. Finally, the Court has adopted the "transactional" test espoused by the Restatement (Second) of Judgments for determining whether two proceedings constitute the "same cause of action" for purposes of res judicata. *See Creech v. Addington,* 281 S.W.3d 363, 379 (Tenn.2009). All of Mr. Hooker's lawsuits appear to arise out of his basic contention that the Tennessee Plan for the selection and evaluation of Tennessee appellate judges, codified at Tennessee Code Annotated sections 17–4–101 et seq., is unconstitutional.

7. Under our constitution, judges have a protected interest in maintaining their salaries during the course of their terms. *See* Tenn. Const. art. VI, § 7 ("The Judges of the Supreme or Inferior Courts, shall, at stated times, receive a compensation for their ser-

*dicial Discipline & Disability Comm'n,* 344 Ark. 274, 42 S.W.3d 386, 391 (2001) (finding that recusal was warranted where judge and his wife owned 12,000 shares of stock in a party appearing before the judge); *In re Disciplinary Proceedings Against Ziegler,* 2008 WI 47, 309 Wis.2d 253, 750 N.W.2d 710, 731 (imposing a public reprimand on a judge where she presided over cases involving parties in which she or her husband owned "substantial shares of stock"). Few cases have addressed this issue in the context of salaries incident to the office. In one recent case, however, a suit was filed to challenge an initiative to amend the Michigan constitution, which would have "reduce[d] the salary of every judge by 15 percent and decrease[d] his or her retirement benefits." *Citizen's Protecting Mich.'s Constitution v. Sec'y of State,* 482 Mich. 949, 755 N.W.2d 147, 149 (2008). The Michigan justices determined that "each of our colleagues would . . . be precluded [under the ethics rules] from participation in this case." *Id.* at 150. Because, however, there was no constitutional or statutory method for their replacement, the justices addressed the merits under the "rule of necessity." *Id.*[8]

---

vices, to be ascertained by law, *which shall not be increased or diminished during the time for which they are elected.*" (emphasis added)). In *State ex rel. Maner v. Leech,* 588 S.W.2d 534, 542 (Tenn.1979), the Supreme Court then chosen by partisan, contested elections held that even though the existing government of Knox County expired on August 31, 1980, the county judge, whose eight-year term extended until August 31, 1982, would remain in office until that time "in accordance with the constitutional mandate against diminishing the term of any elected officeholder" contained in article VII, section 1.

8. In *Gay v. City of Somerville,* 878 S.W.2d 124, 128 (Tenn.Ct.App.1994), our Court of Appeals recognized that the "Rule of Necessity permits an adjudicative body to proceed in spite of its possible bias" if no one else is authorized to act. This rule allows an otherwise disqualified judge to participate "if the case cannot be heard otherwise." *Citizen's Protecting Mich.'s Constitution,* 755 N.W.2d at 149 (internal quotation marks omitted). Our Supreme Court rules acknowledge the viability of the rule and recognize that it may, under certain circumstances, potentially "override the rule of disqualification":

> For example, a judge might be required to participate in judicial review of a judicial salary statute, or might be the only judge available in a matter requiring immediate judicial action, such as a hearing on probable cause or a temporary restraining order. In matters that require immediate action, the judge must disclose on the record the basis for possible disqualification and make

reasonable efforts to transfer the matter to another judge as soon as practicable.

Tenn. Sup.Ct. R. 10, Canon 2.11, Comment [3]; *see also Citizen's Protecting Mich.'s Constitution,* 755 N.W.2d at 151–52 (recognizing a disqualifying "economic interest" as to a constitutional initiative to reduce judicial salaries, but declining to recuse based upon the "rule of necessity").

In *Fent v. Oklahoma Capitol Improvement Authority,* 984 P.2d 200, 203, 218 (Okla.1999), one justice, observing that the Governor was a named defendant, pointed out that the rule of necessity applied because of the *"venerable common law adage that no litigant can appoint his own judges." Id.* at 218. "The rule of necessity governs this case not because there is no replacement mechanism but because the exercise of that mechanism, controlled by one who is a party to the lawsuit, would be clouded by grave fundamental[ ]infirmity." *Id.* (footnote omitted). The justice's reasoning was that because "there exist[ed] no constitutionally credible provision for post-recusal filling of vacant seats, the justices ha[d] a duty to decide the controversy notwithstanding their imputed lack of impartiality." *Id.* (emphasis omitted).

Further, in *White v. Priest,* 348 Ark. 135, 73 S.W.3d 572, 575 (2002), a case involving a proposal to cap the salaries of all state employees, the Arkansas Supreme Court recognized the applicability of the rule of necessity because the Governor, who would have otherwise appointed their successors, "would have [had] the same or similar conflict . . . the justices ha[d]."

The circumstances in our state are different than those in Michigan. As indicated, Tennessee has constitutional and statutory provisions which allow the Governor to appoint "special judges" who would have no economic interest in the subject matter of the litigation. While it is arguable that we have no "economic interest" because of the constitutional protections as to compensation set out in article VI, section 7,[9] our inclination is to conclude, as did the Michigan Supreme Court, that there exists the appearance of an "economic interest" in our compensation.

## VI.

In the 2011 order, *In re Hooker,* the full Court, while addressing Mr. Hooker's appeal of sanctions imposed by the Board of Professional Responsibility, spoke with one voice:

> Despite the ... sincerity of Mr. Hooker's beliefs, a litigant's or lawyer's disagreement with the election of a judge has never been found to be an adequate basis for disqualifying a judge from a proceeding that does not directly involve the judge's own election.
>
> *There is no precedent in Tennessee or elsewhere supporting the idea that otherwise qualified judges must be disqualified whenever a litigant or lawyer disagrees with the manner in which they were placed on the bench. Allowing litigants to challenge judges based on dissatisfaction with their election would hamstring the courts and disrupt our system of justice.* In addition, recognizing such a ground of disqualification for judges will only prompt others to challenge or ignore acts of the Legislative or Executive Branches of government

based on their disagreement with the manner in which these officials have been elected.

*In re Hooker,* 340 S.W.3d at 396 (emphasis added).

Since September 1, 2006, this Court has reviewed appeals in literally thousands of cases and, typically, only one litigant prevails. It is at least conceivable that a litigant who is unsuccessful on a claim could, like Mr. Hooker, seek through recusal a "second bite of the appellate apple" in the form of a Special Court. "[G]aming of the judicial system" is not a novel concept and should not be tolerated. *Kennedy,* 336 S.W.3d at 751 (observing that by suing all of the judges in the district "Kennedy apparently thinks he has discovered how to manipulate the system to obtain a substitute judge ... one presumably more to his liking").

Although, in this instance, Mr. Hooker purports to present himself as a candidate for the Court of Criminal Appeals in the August 2, 2012 election, by challenging the propriety of the Governor's appointment of Judge Bivins, Mr. Hooker bases his candidacy on the same allegations made in his 1996 suit, wherein each member of this Court ultimately chose to recuse and special justices were appointed in their places. While we are loathe to surrender the duties of our offices and would ordinarily rely upon principles of stare decisis or res judicata, the ultimate decision of whether or not we should recuse must be made through the lense of Tennessee Supreme Court Rule 10, Canon 2.11(A), which, as stated, sets out an objective standard and requires the disqualification of a judge when "impartiality might reasonably be questioned." Thus, we are faced with the

9. "The Judges of the Supreme or Inferior Courts, shall, at stated times, receive a compensation for their services, to be ascertained by law, which shall not be increased or diminished during the time for which they are elected." Tenn. Const. art. VI, section 7; *State ex rel. Webb v. Brown,* 132 Tenn. 685, 179 S.W. 321, 321 (1915).

proverbial "Hobson's Choice"[10] in that we may either: (1) exercise the constitutional and statutory responsibilities of our offices in a case in which our own impartiality might be questioned, thus putting us at the risk of violating our own rules of judicial conduct; or (2) enter an order of recusal and yield our duties to a special supreme court to be named by our Governor. We also acknowledge our profession's lofty standards of ethics: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Tenn. Sup.Ct. R. 10, Canon 1.2. Further, while the comments to Tennessee Supreme Court Rule 10, Canon 2.11(A) provide that exceptional circumstances may, on occasion, override the reasons for disqualification,[11] the Canon also provides that recusal is appropriate whenever "impartiality might reasonably be questioned." Tenn. Sup.Ct. R. 10, Canon 2.11(A).[12] In observance of the provisions governing judicial conduct, the members of the Court do hereby enter this order of recusal, disqualifying ourselves from any participation in this litigation and certifying to the Governor the need for the appointment of a special supreme court.

## Conclusion

Initially, the previous version of the rule governing recusal, which was in force at the time Mr. Hooker filed his motion in this Court, applies. Secondly, although the principle of stare decisis appears to govern these circumstances, and the State makes a persuasive argument that res judicata serves as a bar, our participation in this appeal must be measured against an objective standard for recusal, which is uniquely applicable to the judicial branch. Although Mr. Hooker has not provided any case law demonstrating that members of the judiciary have an "economic interest" requiring recusal in constitutional challenges to the method of selecting judges, at least one state supreme court opinion we have found in our research so holds. Because our impartiality might reasonably be in question under these circumstances, we enter this order of recusal and certify to the Governor the need for

10. This phrase originated with Thomas Hobson, a livery stable owner in Cambridge, England, in the 16th and 17th century, who reportedly offered customers the choice of either taking the horse nearest the stall door or taking none at all.

In *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913, 927, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004), Justice Antonin Scalia denied a motion for his recusal based upon his relationship with the Vice–President:

Since I do not believe my impartiality can reasonably be questioned, I do not think it would be proper for me to recuse. That alone is conclusive; but another consideration moves me in the same direction: Recusal would in my judgment harm the Court. If I were to withdraw from this case, it would be because some of the press has argued that the Vice President would suffer political damage ... because some of the press has elevated that possible political damage to the status of an impending stain on the reputation and integrity of the Vice President. . . . [R]ecusing in the face of such charges would give elements of the press a veto over participation of any Justices who had social contacts with, or were even known to be friends of, a named official. That is intolerable.

My recusal would also encourage so-called investigative journalists to suggest improprieties, and demand recusals, for other inappropriate (and increasingly silly) reasons. (Citation omitted).

11. *See* Tenn. Sup.Ct. R. 10, Canon 2.11(A), Comment [3].

12. We are mindful of Senate Joint Resolution 710, which proposes to amend article VI, section 3 of the constitution to expressly provide for a "retention election."

the appointment of a special supreme court.

It is so ORDERED.

Chief Justice CORNELIA A. CLARK and Justice WILLIAM C. KOCH, JR., not participating.