IN THE SPECIAL SUPREME COURT OF TENNESSEE
AT NASHVILLE
July 19, 2013 Session

**JOHN JAY HOOKER ET AL. v. GOVERNOR BILL HASLAM ET AL.**

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Davidson County**
**No. 12C-735    Hamilton V. Gayden, Judge**

———————————————

**No. M2012-01299-SC-R11-CV – Filed March 17, 2014**

———————————————

We granted permission to appeal to determine whether certain provisions of the Tennessee Plan, Tenn. Code Ann. §§ 17-4-101 through 17-4-109 (2009), which governs the way in which Tennessee appellate judges are initially selected and thereafter stand for reelection, violate the Tennessee Constitution.    We hold that the issue of the constitutional validity of the Judicial Nominating Commission/gubernatorial appointment process under the Tennessee Plan is moot, and we decline to rule on this issue.    We further hold that the retention election portion of the Tennessee Plan satisfies the constitutional requirement that the judges of the appellate courts be elected by the qualified voters of the State and does not violate the Tennessee Constitution.    We likewise hold that the election of judges to the Tennessee Court of Appeals and the Court of Criminal Appeals of Tennessee on a statewide basis does not violate the Tennessee Constitution.    Accordingly, the portion of the judgment of the Court of Appeals with respect to the issue of the constitutional validity of the Judicial Nominating Commission/gubernatorial appointment process under the Tennessee Plan is vacated and that claim is dismissed.    We affirm the portions of the judgment of the Court of Appeals with respect to the constitutional validity of the retention election portion of the Tennessee Plan and the constitutional validity of the election of Tennessee intermediate appellate court judges on a statewide basis.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Appeals Vacated in Part, Affirmed in Part.**

ANDRÉE S. BLUMSTEIN, Sp. C.J., delivered the opinion of the Special Supreme Court, in which W. MORRIS KIZER, J. ROBERT CARTER, JR., MONICA N. WHARTON, and JAMES R. DEDRICK, Sp. JJ., joined.

John Jay Hooker, Nashville, Tennessee, Pro Se, appellant

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Janet M. Kleinfelter, Deputy Attorney General, for the appellees.

## OPINION

### I.    FACTS AND PROCEDURAL HISTORY

This appeal involves a challenge to the constitutionality of Tennessee Code Annotated sections 17-4-101 through 17-4-119 (2009), known as the "Tennessee Plan," which governs the way in which judges of the Tennessee appellate courts are initially selected and thereafter stand for election.

Plaintiff, John J. Hooker, initiated this lawsuit with a complaint for declaratory judgment filed in the Circuit Court for Davidson County on February 21, 2012. On April 10, 2012, Mr. Hooker amended his complaint. As amended, the suit challenged the Governor's appointment of Judge Jeffrey S. Bivins to the Court of Criminal Appeals under the Tennessee Plan and alleged that the then-impending (August 2, 2012) retention election of Judge Bivins would violate article VI, section 3 and section 4 of the Tennessee Constitution.[1] Although Mr. Hooker purported to sue on his own behalf and on behalf of "all other qualified lawyers who have a right to be candidates for the seat occupied by Judge Biv[i]ns," this is not a class action; Mr. Hooker is the only plaintiff.[2]

Specifically, Mr. Hooker asked that the Tennessee Plan be struck down "because it provides for an unconstitutional appointment by the Governor to fill judicial vacancies that must be filled by the qualified voters in a Special election," and "because it provides for a statewide election of all Court of Appeals judges when the Constitution requires that these judges be elected by the qualified voters of the District in which they reside, and to which they are assigned." He asked also that any further retention elections under the Tennessee Plan be enjoined, including the August 2012 retention election of Judge Bivins, and that the members of the appellate courts of Tennessee be enjoined from taking any further judicial action in any matter.

---

[1]Judge Bivins was initially appointed by Governor Haslam in 2011 via the Judicial Nominating Commission process of the Tennessee Plan to serve the remainder of the term of Judge David Wells, who retired before his term expired. Judge Bivins then stood for retention in the August 2, 2012, general election.

[2]Named as defendants in their representative capacities are the Governor, the Chief Justice of the Tennessee Supreme Court, the Speakers of the House and Senate, the Chair of the House and Senate Judiciary Committees, and the Attorney General. Judge Jeffrey S. Bivins is also a named defendant.

2

Previously over the years, Mr. Hooker and others had filed suits in the state and federal courts challenging the constitutionality of the Tennessee Plan,[3] but the specific claim that the Tennessee Constitution requires voting for intermediate appellate court judges by district, rather than statewide, had not been raised in any of the previous suits. Because the Tennessee Plan had survived these previous challenges, the defendants moved for dismissal based on the doctrine of *res judicata*. On the grounds of *stare decisis,* not *res judicata,* the trial court found the Tennessee Plan to be constitutional and dismissed the case, except for the new claim regarding voting for intermediate appellate court judges by district. On this issue the trial court agreed with Mr. Hooker and held that retention of the judges of the Court of Appeals and the Court of Criminal Appeals may not be voted on statewide, but may be voted on only by the qualified voters of the respective district in which each judge resides and sits.

Mr. Hooker appealed the dismissal. The defendants cross-appealed on the issue of voting by district for the judges of the intermediate appellate courts. In an opinion issued on July 27, 2012, the Court of Appeals, again on the basis of *stare decisis*, affirmed the trial court's decision that the Tennessee Plan is constitutional. But on the new issue raised by Mr. Hooker, the Court of Appeals reversed the trial court's holding. The Court of Appeals found that the Court of Appeals and the Court of Criminal Appeals each is a single, unified court which serves the entire state, and concluded, therefore, that the election of judges to those courts on a statewide basis is consistent with article VI, section 4 of the Tennessee Constitution. We granted Mr. Hooker's application for permission to appeal.

---

[3]The previous cases include *State by Shriver ex rel. Higgins v. Dunn*, 496 S.W.2d 480 (Tenn. 1973); *State ex rel. Hooker v. Thompson*, 249 S.W.3d 331 (Tenn. 1996); *Hooker v. Drowota*, No. 98-034-111 (Davidson Cnty. Ch. Ct., Mar. 25, 1998); *Hooker v. Anderson,* No. 3-00-510 (M.D. Tenn. May 26, 2000) (dismissing federal constitutional challenges to the Tennessee Plan and holding no jurisdiction over the state constitutional law claims), *aff'd Hooker v. Anderson*, 12 Fed. App'x 323 (6th Cir. 2001); *Hooker v. All Members of the Tenn. Supreme Court*, No. 3-02-0787 (M.D. Tenn. July 28, 2003) (federal challenges to the Tennessee Plan held barred by the doctrine of *res judicata*); *Hooker v. Bredesen*, No. 3-06-0753 (M.D. Tenn. Aug. 2, 2006) (voluntarily dismissed); *Bredesen v. Tennessee Judicial Selection Commission*, 214 S.W.3d 419 (Tenn. 2007); *Hooker v. Bredesen,* No. 3:07-0373 (M.D. Tenn. 2007) (consolidated with *Johnson v. Bredesen*, No. 3:07-0372 (M.D. Tenn. 2007) (dismissed under the doctrine of *res judicata*), *aff'd Johnson v. Bredesen*, 356 Fed. App'x 781, 785 (6th Cir. 2009).

## II. ANALYSIS

Mr. Hooker's position before this Court is that the Tennessee Plan violates the Tennessee Constitution in three ways:[4]

(1)     the Tennessee Plan requires appellate court vacancies to be filled by gubernatorial appointment made from nominees selected by the Judicial Nominating Commission, whereas the Constitution requires vacancies to be filled by contested popular election;

(2)     the Tennessee Plan requires a retention election for incumbent appellate judges who wish to be considered for subsequent terms in office, whereas the Constitution requires contested popular elections; and

(3)     the Tennessee Plan requires judges for the Court of Appeals and the Court of Criminal Appeals to be elected statewide, whereas the Constitution requires that only the voters in the district or circuit to which a judge is assigned vote in elections for these intermediate appellate judges.

### A. Judicial Nominating Commission

The Tennessee Constitution provides that the "Judges of the Supreme Court shall be elected by the qualified voters of the State," Tenn. Const. Art. VI, § 3, and that "[t]he Judges of the Circuit and Chancery Courts, and of other inferior Courts, shall be elected by the qualified voters of the district or circuit to which they are to be assigned." Tenn. Const. Art. VI, § 4. "Election" for any given judicial officer must be held on the first Thursday in August next preceding the expiration of a judge's term of service. Tenn. Const. Art. VII, § 5. "No appointment or election to fill a vacancy shall be made for a period extending beyond the unexpired term. Every officer shall hold his office until his

---

[4]Mr. Hooker framed the issues as follows:

(1)     whether the Tennessee Plan is constitutional "in view of the fact that the statute provides that the Governor shall fill by appointment all appellate judicial vacancies for the full and unexpired terms to be followed by a retention election to 'retain or replace' the judges, when the Tenn. Const. requires under Article VI, § 3 and § 4, Article VII, § 4 and § 5, and Article X, § 1 that all appellate judges be elected and 'chosen' at biennial elections both for the full term and the unexpired terms"; and

(2)     whether the Tennessee Plan is constitutional "in view of the fact that all Court of Appeals judges, civil and criminal, must under the statute be elected by the 'qualified voters of the state' in a retention election where the voters vote only to 'retain or replace' and when the Tenn. Const requires that they be elected and 'chosen' by the qualified voters in the 'district to which the judges are assigned.' Article VI, § 4 and Article X, § 1."

4

successor is elected or appointed, and qualified. No special election shall be held to fill a vacancy in the office of Judge . . . , but at the time herein fixed for the biennial election of civil officers; and such vacancy shall be filled at the next Biennial election recurring more than thirty days after the vacancy occurs." Tenn. Const. Art. VII, § 5.

The Tennessee Plan established a Judicial Nominating Commission charged with compiling and submitting to the Governor a slate of three nominees (selected from all the candidates who apply) to fill any judicial vacancy that occurs. Tenn. Code Ann. § 17-4-102 through § 17-4–111. The Governor is then to select one of the three nominees to fill the vacancy.[5] Tenn. Code Ann. § 17-4-112. If the Commission does not supply the slate of nominees within sixty days of receipt of notification of the vacancy, the Governor may appoint any qualified person. Tenn. Code Ann. § 17-4-113. Mr. Hooker challenged the constitutionality of this process on the grounds that the Constitution requires vacancies to be filled not by gubernatorial appointment but by a contested popular election.

The Judicial Nominating Commission as established under the Tennessee Plan in 2009 terminated by operation of law on June 30, 2012. *See* Tenn. Code Ann. § 4-29-233(a)(15) (2011 & Supp. 2013). Pursuant to Tennessee Code Annotated section 4-29-112, the Commission continued in operation to wind up its business and then ceased to exist as of July 1, 2013. Thus, the portion of the Tennessee Plan that governed the nomination and appointment of persons to fill judicial vacancies – one of the portions challenged by Mr. Hooker – is no longer operational and is no longer the law; that part of the statute has been effectively repealed as of July 1, 2013.[6]

When Mr. Hooker initiated this litigation in February 2012 and when he amended his complaint in April 2012, the judicial nominating commission provisions of Tennessee Code Annotated sections 17-4-102 *et seq.* that Mr. Hooker challenged as unconstitutional were still in effect, as they were when the trial court issued its opinion and when the Court of Appeals issued its opinion in July 2012. However, by the time this Court heard oral argument on July 19, 2013, the judicial nominating commission portions of the Tennessee Plan were no longer in effect.[7]

The repeal of the judicial nominating commission provisions of the Tennessee Plan during the pendency of the present appeal to this Court has rendered the issue moot,

---

[5]If the Governor does not find any of the three nominees acceptable, he may ask for a second slate of three nominees.

[6]*See* Op. Tenn. Att'y Gen. No. 13-76, 2013 WL 5669872 (October 9, 2013), which Mr. Hooker filed as supplemental authority in this appeal.

[7]Mr. Hooker himself occasioned much delay in our consideration of the merits of his claim by filing repeated recusal motions and appeals. We could not, of course, even begin to address the merits of any of Mr. Hooker's constitutional claims until all recusal motions and appeals from those motions had been carefully considered and ruled upon.

which raises the question of whether the issue of the constitutionality of filling judicial vacancies via the statutory nominating commission procedure should now be dismissed because it is moot. We answer that question in the affirmative.

Tennessee courts follow self-imposed rules of judicial restraint so that they stay within their province "to decide, not advise, and to settle rights, not to give abstract opinions." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Co*., 301 S.W. 3d 196, 203 (Tenn. 2009) (internal quotation marks omitted). The mootness doctrine is one such rule: a "case must remain justiciable (remain a legal controversy) from the time it is filed until the moment of final appellate disposition." *Id.* at 203-04. A moot case or issue is one that has lost its justiciability for some reason occurring after commencement of the case. *Id.* at 204. A case, or an issue in a case, becomes moot when the parties no longer have a continuing, real, live, and substantial interest in the outcome. *Id.* at 210.

"The long and well established rule in this State is that the Court 'will not decide a moot question, though it be the question of constitutionality of a statute.'" *Tennessee Negro Funeral Directors Ass'n v. Board of Funeral Directors and Embalmers of Tenn.*, 332 S.W.2d 195, 197 (Tenn. 1960) (citations omitted). Where the plaintiff challenged the constitutionality of a statute and the statute was repealed after the case was initiated but before it was heard, the repeal rendered the case moot, since the challenged statute was no longer the law of the land. *Id.*

This mootness rule was revisited and refined more recently in *Norma Faye Pyles Lynch Family Purpose LLC*, 301 S.W. 3d 196. The general rule remains that appellate courts "should dismiss appeals that have become moot regardless of how appealing it may be to do otherwise." *Id.* at 210. However, even though a case or an issue may have become moot, before dismissing it a court should consider whether to exercise its discretion to apply one of the recognized exceptions to the mootness doctrine.

Those exceptions, applicable in the court's discretion, may arise:

(1)     when the issue is of great public importance or affects the administration of justice;

(2)     when the challenged conduct is capable of repetition and is of such short duration that it will evade judicial review;

(3)     when the primary subject of the dispute has become moot but collateral consequences to one of the parties remain; and

(4)     when the defendant voluntarily stops engaging in the conduct.

*Id.* at 204.

Only the public interest exception is potentially applicable in this case. A court may exercise its discretion to address even a moot issue in exceptional circumstances and if the issue is one of great importance to the public. *See id.* at 210. Exercise of that discretion is guided, as a threshold matter, by the following considerations:

(1)     the public interest exception should be invoked only with regard to issues of great importance to the public and the administration of justice;

(2)     the public interest exception should not be invoked in cases affecting only private rights and claims personal to the parties;

(3)     the public interest exception should not be invoked if the issue is unlikely to arise in the future; and

(4)     the public interest exception should not be invoked if the record is inadequate or if the issue has not been effectively addressed in the earlier proceedings.

*Id.* at 210-11 (internal quotation marks omitted).

If these threshold considerations do not exclude invocation of the public interest exception, the court must then balance the interests of the parties, the public, and the courts to determine whether the issue, albeit moot, should not be dismissed. The following factors, among others, may be considered in balancing the interests involved:

(1)     the assistance that a decision on the merits will provide to public officials in the exercise of their duties;

(2)     the likelihood that the issue will recur under similar conditions regardless of whether the same parties are involved;

(3)     the degree of urgency in resolving the issue;

(4)     the costs and difficulties in litigating the issue again; and

(5)     whether the issue is one of law, a mixed question of law and fact, or heavily fact-dependent.

*Id.* at 211.

We decline to invoke the public interest exception to the mootness doctrine in this case. The threshold considerations alone preclude invocation of the public interest exception.

To be sure, the question of how judges are selected in Tennessee is one of immense public importance. Since the judicial nominating commission portions of the

7

statute no longer exist, the statutory Judicial Nominating Commission no longer affects future appointments and any opinion as to its constitutionality would be advisory only. An advisory opinion on the constitutionality of a now-lapsed judicial nominating commission process would not serve the public interest.

The public interest exception should not be invoked in a matter affecting only private rights. All that is still at stake is Mr. Hooker's personal right, if any, to have been a candidate for Judge Bivins' seat on the bench. This is not a class action; no other rights are involved.

Mr. Hooker is incorrect in his contention that, if the judicial selection process is declared unconstitutional, the result would be the automatic invalidation of all acts of all judges who were elected to office under the Tennessee Plan. Under both federal law and Tennessee law, the doctrine of *de facto* validity of officers would prevent such a remedy and such a result.

The *de facto* validity doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office was deficient. *Norton v. Shelby County*, 118 U.S. 425, 441 (1886). The doctrine protects against the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question and it insures the orderly functioning of the government despite technical defects in title to office. *Id.*

Under federal law, the *de facto* validity doctrine has long been applied in cases involving challenges by criminal defendants to the authority of a judge who participated in the proceedings leading to their conviction and sentence. *See Ball v. United States*, 140 U.S. 118 (1891); *McDowell v. United States*, 159 U.S. 596 (1895); *Ex parte Ward*, 173 U.S. 452, 456 (1899) (holding "the title of a person acting with color of authority, even if he be not a good officer in point of law, cannot be collaterally attacked").

The *de facto* validity doctrine is also applied in civil cases under federal law. In *Buckley v. Valeo*, 424 U.S. 1 (1976), the plaintiffs challenged the appointment of the Federal Election Commission members on separation of powers grounds. The Supreme Court held that the appointment of four members of the Commission by Congress, rather than by the President, violated the Appointments Clause, but nonetheless accorded the past acts of the Commission *de facto* validity. *Id.* at 142. Similarly, in *Connor v. Williams*, 404 U.S. 549, 550-551 (1972), the Supreme Court decided that legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment were nevertheless valid.

The *de facto* validity doctrine applies as well to judicial officers. In *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 87-89 (1982), the Supreme Court concluded that the broad grant of jurisdiction to the bankruptcy courts contained in 28 U.

S. C. § 1471 was unconstitutional.  But, citing *Buckley v. Valeo*, 424 U.S. at 142, *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376-377 (1940), and *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, n. 9 (1982), the Court declined to give that holding retroactive application because retroactive application "would surely visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts."  *Id.*

Tennessee has, likewise, long applied the *de facto* validity doctrine to public officials, and, in particular, to judges in both civil and criminal cases.  Like its federal counterpart, the Tennessee doctrine of *de facto* validity is designed to protect against the chaos and immense expense that would ensue if the acts of judges who were not elected in accordance with the Tennessee Constitution were automatically invalidated.  *Bankston v. State*, 908 S.W.2d 194, 198 (Tenn. 1995).  A judge acting under color of law and with the acquiescence of the litigants  qualifies as a judge in fact whose ruling controls even if his or her authority is constitutionally invalid.  *Jordan v. Knox*, 213 S.W. 3d 751, 774 (Tenn. 2007).  The doctrine of *de facto* validity of officers extends to judges, and the official acts of a judge *de facto* are binding on third parties and the public.  *Bankston*  908 S.W.2d at 196; *State ex rel. Newsom v. Biggers*, 911 S.W.2d 715, 718 (Tenn. 1995).

Accordingly, even if we were to hold that the Tennessee Plan is in whole or in part unconstitutional, it would not follow that all cases previously decided by judges who hold or held office under the Tennessee Plan would be void.  The doctrine of *de facto* validity would operate to protect the public against such a result.  Nor would it follow that all the sitting judges, including Judge Bivins, would immediately have to vacate their positions or cease ruling on matters.  Under the doctrine of *de facto* validity and the policies behind it, this Court could stay its holding for an appropriate period to ensure an orderly transition, so that, for example, the sitting judges could serve out their then-current terms.

Further, there is nothing in the record to indicate that the issue is likely to arise in the future under similar conditions.  The Legislature did not see fit to recreate the Judicial Nominating Commission in anticipation of – or after – its recent sunset.  To the contrary, the Legislature has proposed instead a constitutional amendment that would do away with the Tennessee Plan entirely.  There is no indication in the record that the Legislature will resurrect the Judicial Nominating Commission between now and November 4, 2014, when that constitutional amendment will be voted on by the electorate.  Nor is there any indication in the record that the Legislature will restore the Judicial Nominating Commission after the November 4, 2014, election should the proposed constitutional amendment fail.  On the contrary, Mr. Hooker has filed post-argument papers that suggest just the opposite.  He asserts in those filings that some leading legislators believe that the Tennessee Plan is unconstitutional.  If that is correct, then it would stand to reason that the Legislature will not re-enact legislation that it deems unconstitutional.

Even if the threshold considerations for invoking the public interest exception were met, the balancing factors do not point to sufficiently "exceptional circumstances"

9

and do not weigh in favor of invoking the exception. A decision on the merits will not assist public officials in the exercise of their duties. Since the Judicial Nominating Commission no longer exists, there are no commissioners and thus no public officials who have any duties in that respect.

Mr. Hooker moved this Court to take judicial notice of an opinion issued by the Attorney General on October 9, 2013, and we granted that motion, treating it as a motion under Tennessee Rule of Appellate Procedure 14 for the filing of supplemental authority. The Attorney General has opined that, despite the termination of the Judicial Nominating Commission, the Governor may still make appointments to fill judicial vacancies because Tennessee Code Annotated section 17-4-113 authorizes the Governor to make such appointments if the Judicial Nominating Commission does not timely provide a slate of candidates. Op. Tenn. Att'y Gen. No. 13-76, 2013 WL 5669872 (October 9, 2013). In reliance on this Tennessee Attorney General Opinion, Governor Haslam issued Executive Order No. 34 establishing the Governor's Commission for Judicial Appointments which is to operate in a manner similar to the defunct Judicial Nominating Commission.

We express no opinion on the correctness of Tennessee Attorney General Opinion No. 13-76, nor do we express any opinion on the constitutionality of Executive Order No. 34. Neither question is within the scope of Mr. Hooker's suit or within the scope of his appeal to this Court. Put another way, since both questions are beyond the mandate for which this Special Supreme Court was commissioned, we may not and do not address them. *See Holder v. Tennessee Judicial Selection Comm'n*, 937 S.W.2d 877, 881 (Tenn. 1996).

Indeed, separate lawsuits have been filed challenging Executive Order No. 34 and the reasoning of Tennessee Attorney General Opinion No.13-76 on which Executive Order No. 34 rests. During the winding-up year of the Judicial Nominating Commission, Governor Haslam appointed successors to three appellate judges who announced plans to retire in 2014. Apparently recognizing that the constitutionality of those appointments is not within the scope of his appeal now before us, on June 10, 2013, Mr. Hooker filed a separate lawsuit challenging those appointments. *Hooker v. Haslam* (Case #2), No. 13C-2378 (Davidson Cnty. Cir. Ct. filed June 10, 2013). Mr. Herbert Moncier has also filed a lawsuit in federal district court in Knoxville challenging the constitutionality of the Governor's Commission for Judicial Appointments (Executive Order No. 34). *Moncier v. Haslam*, No. 3:13-CV-00630 (E.D. Tenn. filed October 18, 2013).

At this stage, there does not appear to be any special urgency to resolve the moot issue. First, because of Executive Order No. 34 there is currently in place a mechanism for filling judicial vacancies. Second, on November 4, 2014, the electorate will decide whether to amend the Tennessee Constitution with respect to the method of judicial selection. If the constitutional amendment passes, not only does the issue of the constitutionality of the Judicial Nominating Commission remain moot, but the issue of the constitutionality of the retention election portion of the Tennessee Plan will become

moot as well. If the constitutional amendment does not pass, the Legislature may or may not re-enact the Tennessee Plan's Judicial Nominating Commission. If the Legislature does not resurrect the Judicial Nominating Commission – or if it enacts some variant – the issue of the constitutionality of the Judicial Nominating Commission remains moot. If the Legislature does re-enact the same legislation, it would not be difficult to bring an appropriate constitutional challenge, since the issue would be mainly one of law.

We hold, therefore, that the issue of the constitutional validity of the Judicial Nominating Commission/gubernatorial appointment process under the Tennessee Plan is moot, and we decline to rule on this issue. Accordingly, the judgment of the Court of Appeals on this issue is vacated and that claim is dismissed.

### B.     Retention Election

We turn next to the question of the constitutional validity of the retention election portion of the Tennessee Plan. The Constitution provides that the "Judges of the Supreme Court shall be elected by the qualified voters of the State," Tenn. Const. Art. VI, § 3, and that "[t]he Judges of the Circuit and Chancery Courts, and of other inferior Courts, shall be elected by the qualified voters of the district or circuit to which they are to be assigned." Tenn. Const. Art. VI, § 4. The Constitution further provides that "[t]he election of all officers, and the filling of all vacancies not otherwise directed or provided by this Constitution, shall be made in such manner as the Legislature shall direct." Tenn. Const. Art. VII, § 4.

Under the Tennessee Plan, an incumbent appellate judge who seeks to fill the unexpired term to which he or she was appointed or who seeks re-election for a full eight-year term must take certain steps to qualify as a candidate for office. The candidate is then evaluated by the Judicial Performance Evaluation Commission, which makes a recommendation either for retention or for replacement. If the Commission recommends replacement, then the office is filled by means of a contested popular election. If the Commission recommends retention, then the name of the candidate, without party designation, is submitted to the electorate of the State in the regular August election on a ballot that asks the voters to make the following choice:

Shall (*Name of Candidate)* be retained or replaced in office as a Judge of the *(Name of the Court)*?

_____ Retain

OR

_____ Replace.

Tenn. Code Ann. §§ 17-4-114 and 115.

Mr. Hooker argues in essence that the "retain" or "replace" ballot is unconstitutional because the phrase "shall be elected by the qualified voters" in the Tennessee Constitution requires that the voters be given a choice of two or more candidates in a contested popular election. The issue to be decided is, therefore, whether giving the voters a choice between retaining or replacing a judge is an "election" within the meaning of article VI, section 3 and section 4 of the Tennessee Constitution.

The Tennessee Supreme Court has addressed this issue in two prior cases, namely in *State by Shriver ex rel. Higgins v. Dunn,* 496 S.W.2d 480 (Tenn. 1973), and *State ex rel. Hooker v. Thompson*, 249 S.W.3d 331 (Tenn. 1996). Looking to those two earlier decisions, both the trial court and the Court of Appeals held, based on the doctrine of *stare decisis*, that the retention election feature of the Tennessee Plan meets the constitutional requirement that judges be "elected by the qualified voters."

The doctrine of *stare decisis* embodies the principle that a judicial decision should not be lightly overruled once it has been implemented and acted under for a period of time as long as the decision is not repugnant to some rule of law of vital importance. *In re Estate of McFarland*, 167 S.W.3d 299, 305 (Tenn. 2005). *Stare decisis* is based on the policy of giving "firmness and stability to principles of law" so that people may know their legal rights and plan their affairs accordingly. *J.T. Fargason Co. v. Ball*, 159 S.W. 221, 222 (1913).

But *stare decisis* is neither "a universal inexorable command" nor an "inflexible rule." *Alcazar v. Hayes*, 982 S.W.2d 845, 853 n. 5 (Tenn. 1998). Although *stare decisis* is a policy of great importance, there are instances when settled rules of law must nevertheless be overturned. When there is obvious error or unreasonableness in the precedent, a change in conditions that makes the precedent obsolete, the likelihood that adherence to precedent would cause greater harm to the community than would disregarding *stare decisis*, or, especially, when there is an inconsistency between precedent and a constitutional provision, then *stare decisis* may and should be disregarded and the precedent overruled. *In re Estate of McFarland*, 167 S.W.3d at 306.

In fact, the doctrine of *stare decisis* is less compelling in constitutional cases than in other cases since the ultimate touchstone of constitutionality is the Constitution itself. *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). The Tennessee Supreme Court "'recognizes to its fullest extent the necessity for stability, consistency, and a firm adherence to the doctrine of stare decisis in passing upon and construing any provision of the organic law; but if an error has been committed, and becomes plain and palpable, the court will not decline to correct it, even though it may have been reasserted and acquiesced in for a long period of years.'" *Summers v. Thompson*, 764 S.W.2d 182, 199 (Tenn. 1988) (Drowota, J., concurring) (quoting *Arnold v. Mayor and Aldermen of the City of Knoxville*, 90 S.W. 469, 470 (1905)). Thus, even a "long and unchallenged

custom cannot constitutionalize a practice that is eventually shown to be repugnant to the fundamental law." *Id.*

Moreover, it is not for the Court to consider the consequences or make policy choices in deciding whether precedent should be overturned when it is inconsistent with the Constitution. "If the Constitution is to remain viable and its integrity maintained, this Court has no alternative but to enforce it regardless of any lesser policy considerations . . . . 'No argument from policy, or inconvenience, or the harmony of the system can be permitted to have any weight in the decision of [a constitutional] question.'" *Id.* (citations omitted). Still, the power to overrule former decisions "is very sparingly exercised and only when the reason is compelling." *Edingbourgh v. Sears, Roebuck & Co.*, 337 S.W.2d 13, 14 (1960).

Mr. Hooker contends as a threshold matter that neither *Higgins v. Dunn* nor *Hooker v. Thompson* properly may be the basis for application of the doctrine of *stare decisis*. According to Mr. Hooker, two of the judges making up the majority in *Higgins v. Dunn* were constitutionally incompetent because they were regular members of the Supreme Court and were potential candidates for election in 1974 under the retention election provisions of the Tennessee Plan. As a result, Mr. Hooker contends, the judgment in *Higgins v. Dunn* is void because it was not rendered, as required, by at least three competent members of the Court.

Even assuming that two of the judges were constitutionally incompetent, Mr. Hooker's argument overlooks the effect of *de facto* validity. The opinion in *Higgins v. Dunn* was authored by Justice McCanless, with Justice Chattin and Special Justices McAmis and Wilson concurring. Justice Humphreys dissented, and Justice Dyer did not participate. There is nothing to suggest that the competence of Justices McCanless or Chattin was challenged by any of the parties to that case. As judges acting under color of law and with the acquiescence of the litigants, they were qualified as judges in fact whose ruling controls even if their authority was constitutionally invalid. *See Jordan*, 213 S.W. 3d at 774. Their official acts are not subject now to collateral challenge; those acts are binding on third parties and the public – including Mr. Hooker. *Bankston*, 908 S.W.2d at 196; *Biggers*, 911 S.W.2d at 718.

Mr. Hooker also argues against the application of *stare decisis* on the theory that the issue of the Tennessee Plan's constitutionality was not actually before the Court in *Higgins v. Dunn* and so was not properly decided in that case, making the holding in that case invalid as it pertains to the constitutionality of the Tennessee Plan's retention election provisions. Mr. Hooker then posits that the later holding in *Hooker v. Thompson* is tainted – and invalid – because it relied on and treated as a matter of *stare decisis* the earlier, invalid case.

However, the constitutionality of the Tennessee Plan's retention election provisions was properly before the Court in *Higgins v. Dunn.* The suit involved

13

competing claims of two persons to a seat on the Tennessee Supreme Court left vacant by the death of a sitting justice. To adjudicate those claims the Supreme Court identified as one of the issues before it "[w]hether or not Sections 17-701 to 17-716, T.C.A., the statutory sections providing for the non-partisan election of judges, are in conflict with Article 6, Section 3 of the Tennessee Constitution and therefore unconstitutional." 496 S.W.2d at 487. That issue arose in the context of the case because the "attack on the statute providing a non-partisan method of filling vacancies in our appellate courts (Chapter 198 of the Public Acts of 1971, now Sections 17-701 to 17-716, inclusive, T.C.A.) is based entirely on the insistence that the voting provided for in Sections 17-714 and 17-715 is not an election within the requirements of Article 6, Section 3, and Article 7, Section 5, of our Constitution." *Id*. at 489.

Deciding this particular issue, the majority in *Higgins v. Dunn* upheld the constitutionality of the Tennessee Plan. *Id*. at 490. It reasoned as follows:

> The Constitution of Tennessee does not define the words, "elect," "election," or "elected" and we have not found nor have we been referred to any provision of the Constitution or of a statute or to any decision of one of our appellate courts defining these words.
>
> There are three instances in which the Constitution provides for referenda and refers to them as elections: Art. 2, Sec. 29, . . . Art. 11, Sec. 3, . . . [and] Art. 11, Sec. 9 . . . .
>
> It seems to us that if the Constitution itself denominates these methods of ratification as elections, it cannot be that [the Tennessee Plan] is unconstitutional because the elections therein provided for are limited to approval or disapproval. So are the elections provided in Sections of the Constitution referred to above. This is particularly the case, since Article 7, Section 4 reposes wide discretion in the Legislature with respect to elections and the filling of vacancies.

*Id*. at 489 (footnote omitted).

Justice Humphreys authored a strong dissent in *Higgins*. He began with the proposition that the "recall election"[8] part of the Tennessee Plan is "obviously contrary" to the Constitution, which has "ever since the adoption of the first constitution in 1796"

---

[8]Although Justice Humphreys refers to the retention election in the Tennessee Plan as a recall election, there is, technically, a separate constitutional provision for recall of judges. Article VI, section 6 of the Tennessee Constitution provides that state judges may be removed from office for cause by a concurrent two-thirds vote of each House of the General Assembly.

given "the people the right both to nominate and elect their constitutional officers."[9] Justice Humphreys was concerned that the retention election provision of the Tennessee Plan is a slippery slope that will culminate in the erosion of this right by placing too much power in but one of our three co-equal branches of government. For example, a contested popular election is decided by which candidate receives the most votes, but in a retention election the percentage required for retention is fixed by the Legislature.[10] His concern extended past elections for judicial office. If "election" can include a "recall referendum" for judges, then it can include recall referenda for the election of representatives, senators, district attorneys general, and all other civil officers. Finally, Justice Humphreys feared that:

> by turning over to the Legislature the right to say how Supreme Court Judges shall be chosen, this Supreme Court abdicates its place as a coequal part of our tripartite state government, and subordinates itself to the Legislature. Of this subordination, there can be no doubt. Where once the Constitution protected this Court, and preserved it, it must now take its chances with the Legislature. Today the Plan provides for recall by majority vote. But this is only statutory, so what is to keep the Legislature from providing for recall by a different percentage. For that matter, what is to keep it from saying that a judge must be approved by an affirmative vote of such a percentage as will empty the Bench of presently serving judges? If all of this is truly within the power of the Legislature, there is nothing to save this Court.

*Id*. at 493-494.

Twenty-three years later, in *Hooker v. Thompson*, a Special Supreme Court[11] again addressed the constitutionality of the Tennessee Plan. The Tennessee Plan was attacked "as unconstitutional under various provision[s] of the Constitution of Tennessee, specifically Article I, Sections 4 and 5, Article II, Section 1, Article VI, Section 3, and Article XI, Section 16." 249 S.W.3d at 336-337. "The gravamen of appellants' position [was] that a 'retention election,' as contemplated under the Tennessee Plan, is not a 'free

---

[9]That statement is not accurate as it pertains to judicial officers. The Tennessee Constitution of 1796 did not provide for an independent judicial branch, but left it to the Legislature to create courts and elect judges. The 1834 Constitution established the Supreme Court and provided that judges would be appointed by joint vote of both houses of the Legislature. Not until the ratification of an amendment in 1853 did the Constitution first require all judges to be "elected by the qualified voters."

[10]The Tennessee Plan currently specifies that retention – like replacement – requires a majority vote. Tenn. Code Ann. §§ 17-4-114 and 115.

[11]Special Justices William H. D. Fones, Martha S. L. Black, S. Morris Hadden, Lin S. Howard, and A. C. Wharton sat on the Special Supreme Court in *Hooker v. Thompson.*

and equal' election and deprives the qualified voters of this state of the opportunity to elect Supreme Court judges." *Id.* at 337.

The *Hooker v. Thompson* Special Supreme Court again upheld the constitutionality of the Tennessee Plan. In doing so that Court relied to a large extent on *Higgins v. Dunn*. It found that the "issue of whether yes/no retention elections violate the Constitution of Tennessee ha[d] previously been decided by the Tennessee Supreme Court in the case of *State ex rel. Higgins v. Dunn*, 496 S.W.2d 480 (Tenn.1973), and no compelling reason has been given to persuade this Court that it should disturb that ruling." *Id.* at 337. Nevertheless, the Special Supreme Court independently analyzed the question, giving special heed to – but ultimately rejecting – Justice Humphreys' dissent in *Higgins v. Dunn*:

> Although the dissent of Justice Humphreys makes a number of good points, this Court concludes that it must follow the majority in *Higgins*. To rule the meaning of the term "election" as used in the Tennessee Constitution is limited to the popular concept of an election (*i.e.*, a choice among one [*sic*] or more candidates in which the candidate with the most votes wins the office), would be to hold, in effect, that the Tennessee Constitution uses an internally inconsistent definition of "election." . . .

> Thus, it being the duty of this Court, if there is a doubt as to the meaning of the Constitution or a seeming conflict, ". . . to harmonize such portions and favor the construction which will render every word operative . . . ," *Shelby County v. Hale*, 200 Tenn. 503, 292 S.W.2d 745 (1956), this Court holds that the yes/no retention vote provided for in the Tennessee Plan is in compliance with the Article VI, Section 3 mandate of the Tennessee Constitution that Judges of the Supreme Court be "elected by the qualified voters."

*Id.* at 337-338 (footnote omitted).

In sum and substance, Mr. Hooker's two threshold, technical arguments against the application of *stare decisis* are both without merit. The Justices of the *Higgins v. Dunn* Court were competent *de facto*, even if one were to assume that they were not competent *de jure*. The same issue Mr. Hooker raises in this case with respect to the constitutional validity of the retain/replace ballot as an election by the qualified voters was before the Supreme Court and was, therefore, properly decided by the Supreme Court in *Higgins v. Dunn*. Even if the *Hooker v. Thompson* Court had relied entirely on *Higgins v. Dunn* and had summarily concluded that *stare decisis* prevented further consideration, it would not have been relying on an invalid opinion. In fact, however, the opinion in *Hooker v. Thompson* reflects that the Special Supreme Court in that case also itself considered and analyzed the question before rejecting Mr. Hooker's challenge to the constitutionality of the retention election portion of the Tennessee Plan.

16

While we could, therefore, dispose of this issue on the basis of *stare decisis*, we have undertaken an independent review in order to obviate any further attempts to bring taint and invalidity challenges to existing precedent. Our independent analysis – which differs from the analysis in *Higgins v. Dunn* and *Hooker v. Thompson* – leads us to the conclusion that the retention election portion of the Tennessee Plan is constitutional.

In arriving at that conclusion we strictly followed the admonition of *Summers*, 764 S.W.2d at 199 (Drowota, J., concurring) (quoting *Arnold*, 90 S.W. at 470) and gave no weight to policy considerations about what may or may not be the best way to select and keep in place an impartial, independent judiciary. We looked only to the language of the Tennessee Constitution in light of the well-settled rules of construction of constitutional provisions.

Courts are to construe constitutional provisions as written without reading any ambiguities into them. As Mr. Hooker urges, the words and terms in the Constitution should be given their plain, ordinary and inherent meaning. When a provision clearly means one thing, courts should not give it another meaning. The intent of the people adopting the Constitution should be given effect as that meaning is found in the instrument itself, and courts must presume that the language in the Constitution has been used with sufficient precision to convey that intent. *State ex rel. Sonnenburg v. Gaia*, 717 S.W.2d 883, 885 (Tenn. 1986).

Constitutional provisions will be taken literally unless the language is ambiguous. When the words are free from ambiguity and doubt and express plainly and clearly the sense of the framers of the Constitution there is no need to resort to other means of interpretation. *Shelby County v. Hale*, 292 S.W.2d 745, 748 (1956). But if there is doubt about the meaning, the Court should look first to the proceedings of the Constitutional Convention which adopted the provision in question as an aid to determining the intent of the framers. *Id*.

The Constitution provides that the "Judges of the Supreme Court shall be elected by the qualified voters of the State," Tenn. Const. Art. VI, § 3, and that "[t]he Judges of the Circuit and Chancery Courts, and of other inferior Courts, shall be elected by the qualified voters of the district or circuit to which they are to be assigned." Tenn. Const. Art. VI, § 4. The phrase "shall be elected by the qualified voters" certainly encompasses an election in which several candidates run for the same office and the members of the public each votes for the candidate he or she wants in that office – *i.e.*, a contested popular election. The question is whether the phrase "shall be elected by the qualified voters" refers exclusively to a contested popular election, or whether it also includes

other kinds of elections in which the members of the public vote, such as a referendum[12] or a retention election.

Mr. Hooker insists that the word "elected" in article VI, section 3 and section 4 means, exclusively, the result of a popular, contested election.[13]   He supports this position by pointing out that the words "elected" and "chosen" are used interchangeably in the Constitution with reference to judicial office.  He correctly notes, for example, that when article X, section 1, requires every person "chosen or appointed to any office of trust" to take an oath to support the Tennessee Constitution, it means that both elected and appointed public officials must take that oath.  The word "chosen" is also used to refer to elected officials in article III, section 2 (the "Governor shall be chosen by the electors of the members of the General Assembly"), article XI, section 3 ("the general assembly then next to be chosen," "the next general election in which a Governor is to be chosen," and "the delegates to such convention shall be chosen at the next general election"), and article XI, section 9 (providing for a charter commission of seven members "chosen at large . . . in a municipal election").  Because the two words are used interchangeably and are synonyms, Mr. Hooker says, one may rely on the dictionary definition of "choose" or "chosen" when construing the word "elect" or "election."

We take Mr. Hooker at his chosen word and, as he asked us to do, we went to the dictionary.  "Elect" and "choose" are synonyms as are "election" and "choice."  *Merriam Webster's Collegiate Dictionary* 201, 202, 371 (10th ed. 1997).  "Elect" means "to select by vote for an office … to choose … to decide on."  *Id.* at 371.  "Election" is defined as "the act or process of electing," *i.e.*, the act or process of choosing someone for a public office by voting.  *Id.* at 371.  "Choose" means "to decide on esp. by vote" and includes the concept of selecting between alternatives.  *Id.* at 202.  "Choice" is the act of choosing and includes the concept of accepting one possibility and rejecting another.  *Id.* at 201.

Moreover, the Tennessee Legislature has expressly contemplated that retention elections come within its definition of an election.  The Tennessee Election Code, first enacted in 1972, regulates by statute "all elections by the people."  Tenn. Code Ann. § 2-1-102.   The Election Code defines "election" as "a general election for which

---

[12] A "referendum" is the submission of a proposed public measure on a particular issue to a direct popular vote.  *See Merriam Webster's Collegiate Dictionary* 982 (10th ed. 1997).

[13] The Tennessee Plan was enacted in 1971.  Before the enactment of the Tennessee Plan, judges did run for office in contested popular elections.  In 1973 the Legislature repealed the Tennessee Plan as it applied to Supreme Court judges to prevent Governor Dunn from appointing Republicans to the bench.  As a result, from 1974 until 1993 the candidates for the Supreme Court again ran in "contested" elections, although at times the candidates did not actually face opposition.  For example, in 1990 there were no Republican or independent candidates on the ballot so that the nominees of the Democratic Party for Supreme Court ran unopposed.  In 1993 the Legislature reinstated the Tennessee Plan for the Supreme Court, thereby ending the contested popular elections.  *See A History of the Tennessee Supreme Court*, pp. 270 *ff.* (James W. Ely, Jr., ed., University of Tennessee Press, 2002).

18

membership in a political party in order to participate therein is not required." Tenn. Code Ann. § 2-1-04(a)(7). A "statewide election" is "an election held to nominate or to choose officers elected by or to submit a question to the voters of the entire state." Tenn. Code Ann. § 2-1-104(a)(30). Accordingly, an "election" can be either a contested popular election or a referendum submitting an issue or question to the voters.

According to the plain, ordinary, inherent meaning of "elect," the Constitution requires that the public be given an opportunity to choose, or to decide by voting, who may serve as an appellate judge. A contested popular election offers voters such a choice, but a contested popular election is not the only election process that gives the voters such a choice. A ballot that asks the voters whether one particular person should be retained as a judge or replaced is an election in which the voters are asked to "choose" whether a particular person is the one they want to be a judge. The retention election ballot gives the voters a choice of accepting one alternative and rejecting another. Thus, the Tennessee Plan's retention election ballot fully meets the definition of "elect" because it is a process of choosing someone for public office by voting and it fully meets the definition of "choose" because it allows the public to decide by voting whether a particular person is the person the voters want as judge.

Retention elections are, of course, not identical to elections where voters may have a choice among alternative candidates, but they are nevertheless elections in which the voters are given a choice. It is true that "[r]etention elections, . . . by definition have only one candidate, who is an incumbent, and a limitation on the vote to 'yes' or 'no.'" *Bradley v. Work*, 916 F. Supp. 1446, 1465 (S.D. Ind. 1996) (holding that retention elections, exclusive of the initial nomination and appointment process, are protected by the Voting Rights Act, section 2). However, it is also true that in contrast to a life appointment, a candidate in a retention election is in fact "compelled . . . to vie for popular support just as other political candidates." *Chisom v. Roemer*, 501 U.S. 380, 400 (1991).

In general, elective offices in Tennessee do not depend upon opposition from another candidate, but upon whether the office is filled by the direct exercise of the franchise of the voters. A candidate who does not draw opposition, whether on the ballot or as a write-in, is nevertheless elected; a lack of opposition does not negate the exercise of the vote by the electorate. In other words, one may be elected to public office even though the election was uncontested. *See Ray v. Gantte,* 1987 WL 13250 *1 (Tenn. 1987); *see also A History of the Tennessee Supreme Court*, p.306 (noting that in 1990 there were no Republican or independent candidates on the ballot so that the judicial nominees of the Democratic Party ran unopposed and were elected to the Tennessee Supreme Court).

Since the plain meaning of "elect" in the Constitution includes both contested elections and referenda like the Tennessee Plan's retention election, there is no need to resort to rules of construction. There is, for example, no need to resolve a doubt or an

ambiguity or to "harmonize" various provisions of the Constitution. The word "elect" in article VI is not in tension with the "elections" referred to in articles II and XI: as used in the Constitution, "elect" and "election" encompass both contested popular elections and referenda. Accordingly, because the Legislature is vested with the authority to direct the manner in which appellate court judges are to be "elected," Tenn. Const. Art. VII, § 4, the Legislature has the authority to direct that appellate court judges be elected by referendum, just as the Legislature has the authority to direct that appellate court judges be chosen by contested popular election.

Even if there were an ambiguity to be resolved, our first obligation would be to review the Journal of the 1870 Constitutional Convention that adopted the amendments requiring appellate judges to "be elected by the qualified voters." The Tennessee Constitution of 1796 did not provide for an independent judicial branch, but left it to the Legislature to create courts and elect judges. The 1834 Constitution established the Supreme Court and provided that judges would be appointed by joint vote of both houses of the Legislature. Not until an amendment to the 1834 Constitution was ratified in 1853 were all judges to be "elected by the qualified voters."

The Constitutional Convention of 1870 produced a new Constitution that included the language in article VI, section 3 and section 4 that is at issue in this case. We have carefully examined the Journal of the Proceedings of the 1870 Convention.[14] The Journal shows that the debate about how judges should be selected was one between those favoring appointment by the Governor with the advice and consent of the Senate and those favoring election by the people. The Journal of Proceedings does not reflect any debate about, or consideration of, the difference between a contested popular election and a retention election, nor does it reflect that the framers intended to circumscribe the meaning of "elect" or "election" in a way that would limit its meaning to include only a contested popular election and to preclude a retention election or a referendum.

We hold, therefore, that the retention election portion of the Tennessee Plan satisfies the constitutional requirement that the judges of the appellate courts be elected by the qualified voters of the State.

### C. Statewide Election of Appellate Judges

Finally, we affirm the holding of the Court of Appeals that the intermediate appellate judges are not subject to election only by the voters of the district in which a judge resides. Mr. Hooker challenges the constitutionality of the Tennessee Plan on the grounds that it requires, he claims, judges for the Court of Appeals and the Court of

---

[14]Mr. Hooker did not cite or refer to the Journal of Proceedings of the 1870 Convention in making his argument to this Court. We conclude, therefore, that he does not find anything in the Journal to support his contention that the term "elected by the qualified voters" was intended by the framers of the Constitution to require that judges be elected *only* in a contested popular election between two or more candidates and in no other way.

Criminal Appeals to be elected statewide, whereas article VI, section 4 of the Constitution requires that only the voters in the district in which a judge sits vote in elections for these intermediate appellate judges.

We note at the outset that the Tennessee Plan does not require that judges for the Court of Appeals and Court of Criminal Appeals be elected statewide. Tenn. Code Ann. §§ 17-4-101 to 119. Mr. Hooker points to Tennessee Code Annotated section 17-4-114(b)(1) and section 115(b)(1) as "provid[ing] for the election of all Court of Appeals judges, civil and criminal, by the '**qualified voters of the state**.'" (Emphasis is Mr. Hooker's.) But in fact, the language Mr. Hooker purports to quote from the Tennessee Plan is not in either of those two sections, both of which merely provide that in certain specified situations the name of a candidate for appellate judicial office "shall be submitted to the electorate in this state."

While the language in Tennessee Code Annotated section 17-4-114(b)(1) and section 115(b)(1) (both part of the Tennessee Plan) assumes a statewide election, that language does not provide the statutory requirement for statewide election; it merely reflects the fact that statewide elections for intermediate appellate judges are required under Tennessee Code Annotated section 17-1-103, which is not part of the Tennessee Plan but sets forth the "General Provisions" pertaining to judges. "The judges of the supreme court, court of appeals and court of criminal appeals are elected by the qualified voters of the state at large . . . ." Tenn. Code Ann. § 17-1-103. The Tennessee Plan is merely applying the requirement of section 17-1-103.

Thus, Mr. Hooker's challenge to the constitutionality of the Tennessee Plan on the ground that it requires statewide elections for intermediate appellate judges is misdirected. That challenge is more properly directed at Tennessee Code Annotated section 17-1-103. We therefore treat the question as whether the requirement of section 17-1-103 that intermediate appellate judges be elected statewide is constitutional as applied by and through the Tennessee Plan.

The Tennessee Constitution vests the judicial power of the State in "one Supreme Court and in such Circuit, Chancery and other inferior Courts as the Legislature shall from time to time, ordain and establish." Tenn. Const. Art. VI, § 1. The Constitution further provides that the judges of the Circuit and Chancery courts and of other inferior courts shall be elected by the qualified voters "of the district or circuit to which they are to be assigned." Tenn. Const. Art. VI, § 4.

In 1925 and 1967 the Legislature established the Tennessee Court of Appeals (Tenn. Code Ann. §§ 16-4-101 *et seq.*) and the Court of Criminal Appeals of Tennessee (Tenn. Code Ann. §§ 16-5-101 *et seq.*), respectively. Pursuant to these statutes, the Court of Appeals and the Court of Criminal Appeals are each comprised of twelve judges, no more than four of whom may "reside" in any one of the three "grand divisions" of the State. The three grand divisions of Tennessee, east, middle, and west, are geographical

regions defined by statute to include certain counties. Tenn. Code Ann. § 4-1-201 through § 4-1-204. For the administration of justice in the Supreme Court, the Court of Appeals, and the Court of Criminal Appeals, "the state is divided into the three (3) grand divisions described in §§ 4-1-201 through 4-1-204." Tenn. Code Ann. § 16-2-101.

By contrast, the trial courts created by the Legislature are divided by district or circuits and their jurisdiction is limited to a specific district or circuit. The Legislature has established thirty-one judicial districts, each consisting of certain specified counties. Tenn. Code Ann. § 16-2-506.

The Legislature has further provided that the judges of the Court of Appeals and the Court of Criminal Appeals, like the judges of the Supreme Court, "are elected by the qualified voters of the state at large," while the chancellors, circuit court judges, and judges of other special courts are elected by the qualified voters of the respective judicial district of each trial court. Tenn. Code Ann. § 17-1-103. The intent is that only voters who are served by a particular court should have a say in who sits on that court.

Mr. Hooker argues that the judges of the Court of Appeals and the Court of Criminal Appeals may not be elected statewide because, to meet the constitutional requirement of Tennessee Constitution article VI, section 4, the judges of those inferior courts must be elected only by the "qualified voters of the district or circuit to which they are assigned." The notion is that if an appellate judge only hears cases from and in a particular grand division of the state, he or she should be elected only by the voters of that grand division.

The flaw in this thinking is the underlying assumption that the judges of the Court of Appeals and the Court of Criminal Appeals are "assigned" to a particular circuit or district and that they only hear cases from and in that division. But the judges are not assigned to a particular circuit or district and they do not sit only in one grand division or hear cases only from one grand division. They are each a member of one, single, unified court that serves the entire state.

The Legislature established "*an* appellate court composed of twelve (12) judges, styled the court of appeals." Tenn. Code Ann. § 16-4-101 (emphasis added). The Court of Appeals is required to choose one presiding judge for "the *entire* court." Tenn. Code Ann. § 16-4-104 and § 105 (emphasis added).

This one, unitary Court of Appeals is authorized, but not required, to sit in sections of three judges each, when the court deems it advisable to do so to expedite the decision of cases. Tenn. Code Ann. § 16-4-113. If the Court of Appeals does sit in sections, cases may be transferred among the sections. Tenn. Code Ann. § 16-4-114.

A key statutory provision makes it absolutely clear that, even if the Court of Appeals does sit in sections, no judge is permanently assigned to any section. The

presiding judge of the Court of Appeals has the right "to assign and reassign the judges and the sections." Tenn. Code Ann. § 16-4-113.

Mr. Hooker points to nothing in the record to support his assertion that the judges are assigned to circuits or districts. Instead, he refers us to Rule 2 of the Rules of the Court of Appeals of Tennessee for the proposition that the judges of that court are "assigned" to sit in one of the three grand divisions, but that is not what Rule 2 provides. Rule 2 divides the Court of Appeals into three sections – east, middle, and west – and provides that the four judges who reside in the Eastern Section shall compose the Eastern Section of the Court of Appeals, the four judges who reside in the Middle Section shall compose the Middle Section of the Court of Appeals, and the four judges who reside in the Western Section shall compose the Western Section of the Court Appeals – *unless otherwise designated by the presiding judge*.

Mr. Hooker's argument ignores the fact that Rule 2, like the statute creating the Court of Appeals, permits the presiding judge to designate which judge or judges will sit in which grand division. It also ignores the fact that the Rules of the Court of Appeals may be suspended in the discretion of the Court of Appeals or of any particular panel of that Court. Rule 1(b). It also ignores the fact that the Court of Appeals may in its discretion sit *en banc*. Procedure 6, Court of Appeals Internal Operating Procedures.

The Court of Criminal Appeals operates in much the same way. The Legislature established "*an* appellate court composed of twelve (12) judges, styled the court of criminal appeals of Tennessee." Tenn. Code Ann. § 16-5-101 (emphasis added). The Court of Criminal Appeals is required to choose one presiding judge for the entire court. Tenn. Code Ann. § 16-5-106(a). The Court of Criminal Appeals is required to sit in panels of three, but may also sit *en banc*, or in panels of five or seven, in the discretion of the presiding judge. Tenn. Code Ann. § 16-5-107(d); Rule 5, Rules of the Court of Criminal Appeals. Obviously, when it sits in panels of five or seven, some judges will be sitting outside the grand division in which they reside. There is no statutory analog to Tenn. Code Ann. § 16-4-113 for the Court of Criminal Appeals that authorizes it to sit in sections. Cases may be transferred among the grand divisions in the discretion of the Court of Criminal Appeals. Tenn. Code Ann. § 16-5-110.

Thus, no judge of either the Court of Appeals or the Court of Criminal Appeals is permanently and irrevocably "assigned" to any grand division and is certainly not assigned to any circuit or district. Although the Court of Appeals may sit in sections, those sections are not necessarily always composed of judges residing in the grand division in which the section sits. As the statutes creating these courts contemplate, members of these appellate courts routinely hear cases from grand divisions other than the one in which they reside, the panels (the three judges assigned to hear the cases) may be comprised of members from more than one grand division. Moreover, panels comprised solely of members from one grand division often hear cases that originated in another grand division.

23

The ordinary, plain meaning of the statutory language establishing these two appellate courts leaves no doubt that each court was created as one, single, unified court ("*an* appellate court") which serves the entire state. The statutes creating these courts use the grand divisions merely as the basis for residence for candidates for judicial office, but not for voting or for representation. *Cf., e.g., Dusch v. Davis*, 387 U.S. 112 (1967). There is no reason to limit voting for these judges to the voters of any one particular district or circuit or grand division of the state, since each judge serves the entire state and no judge is assigned to or can be said to represent any district or circuit or grand division. Accordingly, the election of judges to the Tennessee Court of Appeals and the Court of Criminal Appeals of Tennessee on a statewide basis is entirely consistent with the requirements of article VI, section 4 of the Tennessee Constitution.

## IV.  CONCLUSION

In conclusion, the challenge to the constitutionality of the Judicial Nominating Commission under the Tennessee Plan is moot, the ruling of the Court of Appeals on that issue is vacated, and that claim is dismissed. We hold that the retain/replace provision of the Tennessee Plan is constitutional because it meets the constitutional requirement that appellate judges be elected – *i.e.*, chosen – by the qualified voters of Tennessee, and we affirm the ruling of the Court of Appeals on this issue. We hold that the election of judges to the Tennessee Court of Appeals and the Court of Criminal Appeals of Tennessee on a statewide basis is consistent with the requirements of article VI, section 4 of the Tennessee Constitution, since the Court of Appeals and the Court of Criminal Appeals are both single, unified courts, the judges of those courts are not assigned to any district or circuit or grand division, and the judges of those courts serve the entire state. We likewise affirm the ruling of the Court of Appeals on this issue. We deny the injunctive relief requested by Mr. Hooker. All other issues raised by Mr. Hooker are pretermitted in light of our holdings.[15]

The costs of this appeal are taxed to John Jay Hooker, for which execution may issue if necessary.

_____
ANDRÉE S. BLUMSTEIN, SP. C.J.

---

[15] In his brief, Mr. Hooker asserts that Court of Appeals Judge Herschel P. Franks and Special Court of Appeals Judge David G. Hayes, two of the three Judges on the Court of Appeals panel which affirmed the trial court's determination of the constitutionality of the Tennessee Plan, should have disqualified themselves. Based upon our disposition of the case, there is no reason for us to address this issue.